IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 5, 2019

## NICOS BROADNAX v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 12-0261   Jennifer S. Nichols, Judge**

_____

### No. W2018-01503-CCA-R3-PC

_____

The Petitioner, Nicos Broadnax, appeals the denial of his petition for post-conviction relief, arguing that trial counsel's admitting that the Petitioner was guilty of robbery in opening statement was "ineffective and prejudicial." Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, Nicos Broadnax.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Petitioner was convicted of aggravated robbery and sentenced to eleven years in the Department of Correction. His conviction was affirmed by this court on direct appeal and no application for permission to appeal to the Tennessee Supreme Court was filed. State v. Nicos Broadnax and Aaron Cook, No. W2014-00506-CCA-R3-CD, 2015 WL 2374607, at *1 (Tenn. Crim. App. May 15, 2015). This court recited the underlying facts of the case on direct appeal as follows:

> This case arises from the beating and robbery of Oscar Rivera, the victim, in October 2011, for which a Shelby County grand jury indicted the

[Petitioner and the co-defendant] for aggravated robbery. At a trial on the charges, the parties presented the following evidence: The victim testified that he was forty-seven years old and a restaurant owner. He recalled that on October 19, 2011, at a little after 11:00 p.m., he was walking on Macon Road towards Wells Station in Memphis, Tennessee. He explained that he had parked his truck at a Texaco station on Wells Station and, from there, walked to a nearby Mexican bakery that he found to be closed. As he walked back to his truck he heard "some noise" and turned around to see "three or four black men" behind him.

The victim testified that the men were yelling and cursing at him, so he began to run. The victim said that a gun was also aimed at him. As he ran away from the men, he stumbled and fell to the ground. The victim said that, after falling, he attempted to turn around to see the men, and one of the men hit him in the back of the head with the gun. One of the men demanded money from the victim, and the victim pointed to his back pocket where he had "a little bit over" $200 in cash. The victim said there was blood running down his face at this point. One of the men grabbed both the cash and the victim's T-Mobile cell phone. The victim said he "had no option" but to allow the men to take his belongings because they had a gun pointed at his face, and the men had beaten him. He stated that the men beat him on his head and face, leaving him in the fetal position on the ground. He remembered seeing a white car and "somebody yell[ing] something" before one of the men kicked him "on [his] testicles."

The victim testified that he was "in a bad condition," but, when he got up off the ground, the men began running away from him. He stated that he walked toward the gas station. The victim could not provide a "general description" of his assailants but confirmed that they were "young," "African American" men. He said that he never spoke to any of the assailants. Once he arrived back at the gas station, a "Latin person" told him that he would call an ambulance. After five minutes, the victim observed a "white person" talking with the police about the direction in which his assailants had fled. The victim confirmed that he did not know any of the men who attacked him and did not owe any of them money. The victim was taken to the hospital where he stayed overnight and was released the following day. The victim identified scars on his face and head that remained from this incident. After his release from the hospital, the victim stayed home for two weeks recuperating, unable to go to work during this time.

On cross-examination by [the Petitioner]'s attorney, the victim said that the area where this incident occurred was not well-lit. He said that he

was able to run approximately eight to ten steps before he fell and that the men reached him quickly after he fell to the ground. The victim described his fall, saying that he caught himself with his arms before his face hit the ground. He stated that only two of the men beat him. The victim said that he believed he was hit in the head with a gun rather than a fist because the blow caused a laceration.

On cross-examination by [the co-defendant]'s attorney, the victim stated that one of the men who approached him that night wore a red t-shirt. He confirmed that he was unable to identify any of the people involved in the beating and robbery that night.

Jeffrey Bartram testified that on October 19, 2011, he was at his residence on Macon Road. He recalled that he heard "hollering and screaming" outside and looked out the window in his front door. Outside, he saw three black men standing over a hispanic man, beating and robbing him. Mr. Bartram said that he could hear the black men yelling at the victim to give them "what [the victim] got in [his] pockets." He observed the men striking the victim in the face with a silver handgun, and he watched as the men took a cell phone from the victim. Mr. Bartram called the police and then stepped outside his house and "everybody scattered." He said that two of the men ran down the opposite side of the street on the sidewalk to a house directly across the street on the corner of Wells Station and Macon Road. The third man spoke with someone in a vehicle that had pulled up before running westbound down the middle of Macon Road. Mr. Bartram said the victim remained on the ground in the fetal position after his assailants fled. The victim then got up off the ground and "staggered" toward a Texaco station down the street.

Mr. Bartram testified that, while still on the telephone with dispatch, he walked to the Texaco station to check on the victim. He found the victim inside the store of the gas station "bleeding everywhere." The dispatch operator instructed Mr. Bartram to return to his house to wait for police. The police later arrived and took Mr. Bartram to the Texaco station where the police had detained several suspects. Mr. Bartram explained that the beating and robbery occurred next to a street light, so the participants were "pretty much in the spotlight of the street light." While at the Texaco station, Mr. Bartram identified the two suspects that he had observed beating the victim. He also identified in court [the Petitioner] and [the co-defendant] as the men he had observed beating and robbing the victim. Mr. Bartram recalled that one of the assailants wore a "hoodie," one wore a striped Polo shirt, and one wore a white shirt. He identified the "hoodie" that one of the men wore.

Mr. Bartram described the involvement of the three men in this incident as follows:

> They were standing over him, all three of them. [The victim] was laying in a ball in the middle of the street and they were standing over him just mercilessly beating him. Kicking him, punching him. . . . One of them was holding the gun and pointing it at [the victim], then they hit [the victim] with it, then they'd hold [the gun] on [the victim] for a little bit longer, then they hit [the victim] with it again.

On cross-examination by [the Petitioner]'s attorney, Mr. Bartram testified that these events occurred around 11:00 p.m. He estimated that the beating occurred approximately twenty or thirty feet from his front door, where he was when he saw the incident. Mr. Bartram agreed that he testified at the preliminary hearing in this matter that [the Petitioner] did not have the gun but that he could not now recall if [the Petitioner] had possessed the gun. He confirmed that there was nothing obstructing his view of the beating and robbery that night. Mr. Bartram stated that he did not actually see the [Petitioner and the co-defendant] go into the house on Macon Road but that he watched them enter the yard of that residence.

Eduardo Rodriguez testified that he worked at the Texaco station on the night of these events. He recalled that around 11:00 p.m., he observed "a few young African American guys" running to a house located across the street from the Texaco station. Five minutes later, he observed the victim, who appeared to be "disfigured from a beating," walking toward the Texaco station. Mr. Rodriguez went outside and attempted to assist the victim and then called an ambulance.

Lindsey Johnson testified that, on the night of October 19, 2011, she was in a house on Macon Road across the street from the Texaco station. She stated that in the house with her were [the Petitioner], [the co-defendant], Latasha Payton, and Joseph Washington. She said that she had known [the co-defendant] for three years and [the Petitioner] for two years and identified both men in the courtroom. She recalled that around 11:00 p.m., [the Petitioner] and [the co-defendant] entered the house and told Ms. Johnson that a "Mexican had jumped on" them, and they had gone "over there and they both beat [the victim's] a\*\*." They instructed Ms. Johnson that, if police arrived, she was to tell the police that "they ain't heard from him." She said the men mentioned a T-Mobile cell phone, and Mr. Washington responded that he knew how to "unlock it." Ms. Johnson

stated that she observed a weapon with a black handle inside the residence that night.

On cross-examination by [the Petitioner]'s attorney, Ms. Johnson testified that it was [the co-defendant] who had the victim's cell phone on the night of October 19, 2011. Ms. Johnson clarified that she did not see a gun that night but rather saw a gun grip sitting on a chair before the [Petitioner and co-defendant] arrived.

James Moore, a Memphis Police Department officer, testified that he responded to a house on the corner of Macon Road and Wells Station after 11:00 p.m. on October 19, 2011. Once there, he worked with other officers to create a perimeter around the residence to ensure that no one entered or exited the residence. Police officers searched the residence, and upon their exit, one of the officers observed a hand in the garage. Officer Moore, along with several other officers, re-entered the residence and went through the kitchen into the garage. Once in the garage, Officer Moore observed a person hiding under a tarp, and he took this person into custody. Officer Moore identified [the co-defendant] as the person found in the garage. Another suspect was also found in the garage and a third individual was found at the scene but not inside the garage.

Justin Sheriff, a Memphis Police Department officer, testified that he conducted the crime scene investigation of the residence at the intersection of Macon Road and Wells Station. At this location was a single story residence with white trim. Other police officers had already secured the residence by the time Officer Sheriff arrived. Officer Sheriff photographed a stainless steel pistol that the police had found behind a washing machine and dryer inside the residence. Officer Sheriff opened up the cylinder of the pistol and found live rounds inside the cylinder. In a bedroom of the residence, Officer Sheriff collected a purple bag that had twelve rounds of .38 special ammunition inside it. Officer Sheriff identified other photographs that he took at the scene. One of the photographs depicted a pistol grip that police officers found in the refrigerator, separate from the weapon.

Officer Sheriff testified that the pistol was a Ruger SP101. He identified a photograph of the pistol and the serial number on the pistol. Officer Sheriff identified the five "live rounds" taken from inside the pistol.

On cross-examination by [the Petitioner]'s attorney, Officer Sheriff confirmed that the pistol was found inside a sock behind the washer and dryer. He did not recall any blood being on the sock or on the pistol.

Adrian Friday, a Memphis Police Department officer, testified that he was dispatched to a robbery near Macon Road and Wells Station. When he arrived, police officers had already surrounded the house. When the homeowner exited his residence, Officer Friday provided him with a consent to search form, which the homeowner signed. After receiving the consent to search, four police officers went inside to search the residence. After a short period of time, two of the officers returned outside and asked Officer Friday if he would assist in the search. As Officer Friday approached the front door of the house from the south end of the outside of the house, he shone his flashlight through the garage window and observed "an arm of a male black" "sticking out." He alerted the other officers that someone was hiding inside the garage, and the officers made entry into the garage through the house.

Officer Friday testified that one male was found by the garage door and the other was hiding inside a pile of trash bags and clothes. Both men were taken into custody and escorted out of the residence. Officer Friday recalled that [the co-defendant] was one of the men taken into custody and that he was wearing a blue "hoodie" at the time of his arrest. After the men were taken out of the residence, police officers continued to search the residence for a gun. Officer Friday said that he found "the butt of the gun" inside the bottom right drawer of the refrigerator and the "main J frame" of the gun "up under a washing machine" inside a white sock. Officer Friday estimated that the garage door was approximately three feet from the washing machine and dryer.

Glenn Barber, a Memphis Police Department officer, testified that three suspects were developed in this case: [the Petitioner], [the co-defendant], and Joseph Washington. Sergeant Barber said that he interviewed [the Petitioner] and [the co-defendant]. During the interview, [the Petitioner] stated that he was involved in the robbery and "a [cell phone] was taken." He told police that he saw the victim walking down Macon Road and chased him. The victim fell to the ground after being struck one time by [the Petitioner]. Once on the ground, the victim was hit three or four more times. [The Petitioner] told the police that, after the incident, he went to "Joe's house" where he gave the gun, a silver .38 revolver with a black handle, to "Lindsey." [The Petitioner] stated that he had the gun in his waistband at the time of the robbery but used his fist to punch the victim. When he saw police outside the house, he hid inside the garage.

Sergeant Barber testified that [the co-defendant] said that he was having a bad day and "someone" told him he should release his frustration by engaging in a fight. [The co-defendant] stated that he saw the victim walking down Macon Road and began to run behind the victim. The victim also began running and, when [the co-defendant] caught up to the victim, the victim was already on the ground. [The co-defendant] explained the blood on his clothing by telling Sergeant Barber that the victim attempted to pull up off the ground by holding on to [the co-defendant]. [The co-defendant] then went to "Joe's house and was handed a cell phone." Sergeant Barber recalled that [the co-defendant] told him that, once he was back at the residence, "people were asking why he was kind of nervous," and [the co-defendant] responded that "he just got in a fight with a Mexican." [The co-defendant] told Sergeant Barber that, when he noticed the police were outside the residence, he threw the cell phone on the bed and hid in the garage. When asked if [the co-defendant] ever "mention[ed] anything about a weapon," Sergeant Barber responded, "[h]e said it was a silver .38 revolver." [The co-defendant] denied any involvement in a robbery when questioned by the police.

Based on this evidence, the jury convicted [the Petitioner] and [the co-defendant] of aggravated robbery.

Id. at *1-5.

In a pro se petition and an amended petition filed by post-conviction counsel, the Petitioner alleged that he received ineffective assistance of counsel because, among other reasons, trial counsel conceded in his opening statement that the Petitioner was guilty of the lesser-included offense of robbery. The trial court conducted an evidentiary hearing on the petition at which the Petitioner provided the only testimony.[1] We confine our recitation of the testimony from the hearing to that relevant to the issue on appeal.

The Petitioner testified that in opening statement, trial counsel "basically called [him] guilty of simple robbery in front of the [j]ury without [his] permission." Upon further questioning, the Petitioner claimed that counsel did not discuss a strategy with him prior to trial and "never discussed a defense with [him]." He complained that counsel had "[n]ever" come to see him in custody and "never even returned any of [his] phone calls while [he] was incarcerated down here." Instead, he stated that counsel only visited him "[f]or about 20 minutes" on the day prior to trial and did not visit him in the jail during the course of trial. The Petitioner said that he "didn't agree with [counsel] that [counsel] should have said [he] w[as] guilty [at] the outset," and counsel did not have his permission to say that he was guilty of robbery in his opening statement.

---

[1] The Petitioner's trial counsel was deceased at the time of the evidentiary hearing.

On cross-examination, the Petitioner agreed that he admitted his involvement in his statement to police. He also admitted that he had brief conversations with counsel during his eight court settings leading up to trial, although he maintained that counsel never discussed defense strategy.

At the close of the evidentiary hearing, the post-conviction court entered a written order denying the Petitioner's petition. In relevant part, the court found that trial counsel "met with [the] [P]etitioner on several occasions prior to trial[] and developed a defense strategy to attempt to minimize [the] [P]etitioner's role in the events based in part upon [the] [P]etitioner's confession that was given to the police." The court noted in its ruling that after the hearing, the Petitioner's counsel delivered a copy of a recent United States Supreme Court opinion, McCoy v. Louisiana, 138 S. Ct. 1500 (2018), and asked the court to take it into consideration. The Petitioner's counsel asserted that trial counsel was "per se ineffective based on the opinion[.]" The post-conviction court determined that the holding in McCoy was not applicable to the Petitioner's case because "nothing in the record shows that [the] [P]etitioner made a clear assertion of his innocence or made an objection to this particular defense strategy[.]" Accordingly, the post-conviction court determined that relief was not warranted.

## ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred in denying his petition because he did not consent to trial counsel's admission of guilt to robbery in opening statement, violating his "right to decide on the objective of his defense."

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution both guarantee a criminal defendant the right to assistance of counsel. However, "[t]o gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in 'grant[ing] to the accused personally the right

to make his defense,' 'speaks of the assistance of counsel, and an assistant, however expert, is still an assistant.'" McCoy, 138 S. Ct. at 1508 (quoting Faretta v. California, 422 U.S. 806, 819-20 (1975)). It is within counsel's purview to make decisions concerning trial management, such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." Gonzalez v. United States, 553 U.S. 242, 248 (2008) (internal citations omitted). In contrast, a defendant "has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal[.]" Jones v. Barnes, 463 U.S. 745, 751 (1983).

"Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category." McCoy, 138 S. Ct. at 1508. As such, "a defendant has the right to insist that counsel refrain from admitting guilt." Id. at 1505. In other words, "[w]hen a client expressly asserts that the objective of '*his* defen[s]e' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." Id. at 1509. However, counsel's strategic choice to concede partial guilt "is not impeded by any blanket rule [in a capital case] demanding the defendant's explicit consent" when the defendant is unresponsive. Florida v. Nixon, 543 U.S. 175, 192 (2004).

"Because a [defendant]'s autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence[.]" McCoy, 138 S. Ct. at 1510-11. Rather, "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural,'" and a petitioner is entitled to relief when he or she can show that counsel "usurp[ed] control of an issue within [a petitioner]'s sole prerogative." Id. at 1511.

Relying on McCoy, 138 S. Ct. 1500, the Petitioner takes issue with trial counsel's concession of guilt in his opening statement. However, McCoy does not entitle the Petitioner to relief. In McCoy, the petitioner "opposed [counsel]'s assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." Id. at 1509. Whereas here, the post-conviction court determined that "nothing in the record shows that [the] [P]etitioner made a clear assertion of his innocence or made an objection to this particular defense strategy." Moreover, trial counsel did not concede the Petitioner's guilt to the primary offense at any time. Furthermore, the post-conviction court implicitly discredited the Petitioner's claim that he did not agree to conceding involvement in the robbery by its finding that trial counsel "met with [the] [P]etitioner on several occasions prior to trial, and developed a defense strategy to attempt to minimize [the] [P]etitioner's role in the events based in part upon [the] [P]etitioner's confession that was given to the police." Based on the post-conviction court's factual determinations, it appears that the decision to partially admit involvement was an agreed-upon trial strategy likely made due to the identification of the Petitioner and his own

statement to police.  We conclude that the Petitioner's protected right to autonomy was not violated by counsel's partial admission of guilt, and the Petitioner is not entitled to relief.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE