NOT DESIGNATED FOR PUBLICATION

No. 120,137

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WILLIAM PAUL SPANGLER,
*Appellee,*

v.

STATE OF KANSAS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed March 13, 2020.
Affirmed.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellant.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellee.

Before STANDRIDGE, P.J., LEBEN and BRUNS, JJ.

PER CURIAM: The State appeals from the district court's decision granting William Paul Spangler's K.S.A. 60-1507 motion and ordering a new trial. On appeal, the State contends that the district court erred in concluding that Spangler's trial counsel provided ineffective representation. The State argues that the district court applied the wrong legal standard. In the alternative, the State argues that even if the district court applied the correct legal standard, Spangler failed to establish a reasonable probability of a different outcome but for ineffective assistance of trial counsel. Finding no error, we affirm the district court's decision granting the K.S.A. 60-1507 motion.

1

FACTS

In March 2013, the State charged Spangler with one count of murder in the first degree arising out of the shooting of Faustino Martinez in Topeka. Spangler retained Matthew B. Works to represent him at trial. On August 9, 2013, a jury convicted Spangler of second-degree murder. Later, on June 5, 2015, his conviction was affirmed by this court. *State v. Spangler*, No. 112,270, 2015 WL 3632523 (Kan. App. 2015) (unpublished opinion). No petition for review was filed and the Kansas Supreme Court issued a mandate on July 9, 2015.

The facts of the underlying criminal case were summarized on direct appeal as follows:

"On March 23, 201[3], Tino and his family went to Topeka for a family birthday celebration at Gino Martinez' (Gino) apartment. Gino lived in an apartment on the second floor of the Capitol Suites Apartment building (the Building), and Gino's sister lived on the third floor of the Building. The Building's entry way had two sets of doors with an airlock space between them. The inner doors were always locked for the residents' safety. The hallway to each of the three floors was accessible through an unlocked door with the apartment on each floor accessed through a locked door from the common hallway.

"Around 2 a.m., family members returned from a grocery run. To aid in unloading the groceries, Gino placed a box of juice containers in the interior doorway to the stairwell to keep the door from locking so the groceries could be carried in without Gino having to unlock the door. Prior to the family members' return, Gino, Tino, and Dijon Chandler Phillips (DJ) had been in the airlock space smoking cigarettes.

"Around this time, Spangler, who lived in his apartment on the third floor, and his friend, Valerie Mentzer, returned to the Building from a local bar. Spangler testified he had a few beers and a drink while at the bar. While exiting the vehicle, Spangler and Mentzer saw Tino and D.J. at a nearby vehicle. D.J. testified Spangler looked at them and said, 'What the fuck you looking at?' Spangler's comment upset Tino, but he did not verbally respond. Spangler testified he could clearly see D.J. was armed. Tino and D.J.

2

were advocates of open carry and had firearms openly visible on their person. Mentzer and Spangler testified D.J.'s and Tino's staring frightened them and so Spangler told Mentzer, 'Start walking. Don't turn around. I know he's got—just go.' Spangler testified he heard feet scraping behind him. When he turned around, Spangler believed Tino was about to give chase, so he told Mentzer, 'Go, I mean go now.'

"As Spangler and Mentzer entered the Building, Gino held the door open for them. Gino and Spangler recognized each other as tenants of the Building, but they did not know each other personally. Gino testified that when Spangler and Mentzer entered the airlock, he told them, '[D]on't mind the juice boxes,' as an indication a box was holding the door open. Mentzer stepped over the box as she entered. Spangler kicked the box backwards from the door, scattering the juice containers. Spangler testified he kicked the box because he was being chased and he wanted the door to lock. Spangler and Mentzer went up the stairwell to Spangler's apartment. Mentzer testified she ran up the stairs as fast as she could because she was scared for her life. However, Gino testified neither Spangler nor Mentzer were running or moving at a fast pace.

"At trial, Spangler testified that as he was unlocking his door, he heard people coming up the stairs; however, he did not actually see anyone chasing them. Mentzer and Spangler entered the apartment and locked the door. No one knocked on the door or tried to force their way into the apartment. Neither Spangler nor Mentzer called 911.

"While Mentzer was locking the deadbolt, Spangler went into his bedroom and returned with a loaded assault rifle. Spangler testified he retrieved and loaded the assault rifle because Mentzer was crying and he was panicking. At trial, Spangler claimed he had never fired the rifle before, never read the manual, and had no training on how to properly use the rifle. Spangler told Mentzer to lock the door behind him and exited his locked apartment to investigate the people coming up the stairs.

"Spangler's testimony reflects that when he exited his apartment, he looked both directions and saw no one in the hallway. He decided to go looking for the men even though he knew they appeared to be friends with Gino. He took the gun with no bullet in the chamber as a 'scare tactic' because he wanted to make sure the men did not come back upstairs. Spangler walked down the hallway to the stairwell and did not see anyone. He then walked down several flights of stairs between the third floor and the entrance to the Building and did not see anyone in the stairwell. When Spangler reached the first floor landing, he saw Tino, D.J., Gino, and Maria Garcia in the airlock between the exterior

3

door of the Building and the second locked doorway to obtain access to the stairs leading to each floor of the Building.

"Spangler testified that as he approached the group with the assault rifle and before he could address them, Tino stepped forward and said, 'What are you going to do, shoot me?' Spangler testified Tino did not have a gun on him at the time. Spangler further testified that it was silent for a moment and then Tino began slowly walking up the stairs. Spangler did not know what to do because he was not expecting anyone to approach him while he was holding an assault rifle. Here, the testimony of the parties' conflicts as to what happened next—either Spangler went back upstairs without responding to Tino and Tino followed or Spangler turned and fled because Tino was chasing him at full speed. There were no cameras in the stairwell.

"Spangler testified that at the top of the stairs leading to the third floor a struggle occurred between Tino and himself; but despite losing both shoes, he was able to get away from Tino. As Spangler ran down the third floor hallway, he put a bullet in the chamber of the assault rifle, turned towards Tino, and fired a warning shot. Spangler testified Tino just kept coming at him after the warning shot, so he attempted to shoot him in the leg but instead hit him in the lower abdomen. Spangler stated that when Tino was shot, Tino grabbed his abdomen and said, 'I've been shot, I've been shot, help.' Spangler further testified that Tino 'turned around and started walking toward the door that [Spangler and Tino] came in through.' Spangler was observed on videotape fleeing the apartment building using a different stairwell and exit. Spangler ditched the assault rifle under a truck a few blocks away. Tino was approximately 50 feet from Spangler's apartment when he was shot.

"The surveillance video reflects Tino entered the airlock shortly after Spangler and Mentzer went through. Gino testified that when Tino and D.J. entered the airlock, he told them, 'Hey these guys just kicked the juices.' Tino then sat down his drink and put his gun on the ground inside the airlock. The surveillance video reflects Tino and D.J. were trying to enter the interior doors and Gino unlocked the door. D.J. testified he and Tino went upstairs to talk to Spangler about kicking the juice box. D.J. stated Tino was upset over what kind of person would kick kid's juice boxes. D.J. testified when they reached the third floor and did not see Spangler, they went back downstairs. At some point around this time period, Gino handed Tino's gun to D.J. and told him to take it to Gino's apartment and put it away. D.J. went to the second floor apartment and put the gun away.

4

"Maria testified she noticed Spangler standing on the first floor landing. Spangler had an assault rifle that appeared to be pointed at Tino. Maria testified Tino asked Spangler, 'Are you fucking kidding me?' and 'Are you seriously going to shoot me? Are you really going to kill me?'

"Gino also testified and said he followed Tino up the stairs. Gino opened the door to the third floor and saw Spangler with his assault rifle. Tino had his hands down at his sides with his palms face up and open. Gino heard Spangler cock the assault rifle and saw Spangler move toward Tino. Tino asked Spangler, 'Are you going to fucking shoot me?' Scared, Gino turned to run back downstairs. However, as he was running down the stairs, Gino heard a gunshot and Tino's scream. Gino ran to help Tino and called 911. Tino died from blood loss due to the gunshot wound. Detective Scott Dickey with the Topeka Police Department testified he found no evidence of anyone shooting at Spangler and what appeared to be Spangler's first shot was found in the wall of the third floor hallway.

"Spangler was charged with one count of first-degree murder. Prior to trial, Spangler submitted proposed PIK instructions. Spangler initially requested an instruction on self-defense and defense of a dwelling, and during the jury instruction conference he also requested an instruction on defense of another. After hearing each party's arguments, the district court denied Spangler's requested instructions for defense of a dwelling and defense of another. The district court gave Spangler's requested instruction on self-defense.

"The jury found Spangler guilty of second-degree murder. Spangler was sentenced to a term of 186 months' imprisonment with 36 months' postrelease supervision and an order for restitution. Spangler timely appeals." *State v. Spangler*, 2015 WL 3632523, at *1-3.

On October 19, 2015, Spangler filed a pro se K.S.A. 60-1507 motion, raising several issues relating to the performance of both trial and appellate counsel. He later filed two supplemental motions and one amended motion. Ultimately, the district court appointed Gerald E. Wells to represent Spangler to pursue his K.S.A. 60-1507 motion. On December 19, 2017, the district court held an evidentiary hearing. At the hearing, Spangler testified and presented the testimony of four additional witnesses—his mother,

Robert W. Barnett, PhD, Julia Spainhour, and Works. Also, the State called three witnesses—Matthew Peterson, Donald Hoffman, and Jason Hoffman.

*Testimony of Dr. Robert Barnett*

Dr. Barnett testified that he is a clinical psychologist and was retained to conduct a psychological evaluation of Spangler. Dr. Barnett conducted his evaluation on October 26, 2017. Following the evaluation, he prepared a written report stating his opinions. In the report, which the district court admitted into evidence at the evidentiary hearing without objection by the State, Dr. Barnett opined:

> "Specific to this case, there were some of the usual symptoms of post-traumatic stress disorder, particular[ly] vivid nightmares and paranoia.
> "As I mentioned in my report, normally flashbacks would be part of this presentation. But Mr. Spangler did not describe those except as occurring during sleep which is not out of the ordinary.
> "The—one of the critical issues in using this diagnoses is whether or not there is a traumatic event. And in this case it was Mr. Spangler's experience, he described to me, being robbed and beaten several weeks prior to the incident that led to his conviction."

Dr. Barnett testified that Spangler showed some of the hallmark symptoms of post-traumatic stress disorder (PTSD), including nightmares and paranoia. When asked if he could determine whether the prior robbery influenced Spangler's actions leading up to the shooting of Martinez, Dr. Barnett testified: "It's credible. I wasn't there, so I don't know what his state of mind was at the time but what he described to me was credible."

In his written report, Dr. Barnett stated that Spangler "is clear that had he not been robbed and beaten, he would not have purchased any weapons, and would not have reacted aggressively to being threatened in his apartment." Dr. Barnett testified that Spangler's account of the robbery and beating was an important fact in his "diagnostic

6

impression" that Spangler suffered moderate PTSD. He explained that "if there was no traumatic event, there would be no post traumatic stress disorder."

Although Dr. Barnett found that Spangler did not "appear . . . to be suffering from any major mental disease or defect," he rendered the opinion that the robbery did play a role in his actions on the night of the shooting of Martinez "to a moderate degree.'" In response to a question by the State about whether Dr. Barnett would have been able to testify at the trial that Spangler was incapable of forming the intent to kill another person, he responded: "Well, the problem is, you are talking about a time that was three or four years before I did this evaluation. I don't know what an evaluation three years earlier, four years earlier would have produced. I can't speak to that."

*Testimony of Julia Spainhour*

Spainhour testified that she is an attorney with the Kansas Capital Habeas Office and has practiced law since 1996. She testified that she had "tried maybe a hundred trials" as a criminal defense attorney. After providing details of her qualifications and experience, Spangler's counsel proffered Spainhour as an "expert in criminal litigation," and the State responded that it had no objection.

Spainhour testified that she was asked to review the trial record as well as Dr. Barnett's written report. She did so to render an opinion on the question of "whether a defendant's diagnoses of post traumatic stress disorder or other significant mental illness would have made a difference in the way the defense would have been presented." At the hearing, Spainhour testified:

> "Well, it was clear from the trial record . . . that the defense asserted was a self
> defense. And after viewing Dr. Barnett's report, it seemed to offer the existence of some
> evidence that would lead me to believe that the defendant in this case . . . could have been

suffering from post traumatic stress disorder or some other mental illness that would have caused his actions to be affected on the day in question."

Spainhour opined that Spangler's mental health status should have been raised by trial counsel in the context of supporting the request for the lesser included offense instruction of voluntary manslaughter, which requires an unreasonable but honest belief of self-defense. Although Spainhour acknowledged that the district court gave an involuntary manslaughter instruction to the jury, she testified that it was possible that Spangler's "heightened or fragile mental state at the time of the offense" could have been offered as evidence at trial. On cross-examination, Spainhour clarified that in her opinion, "the information that's contained in Dr. Barnett's report should have been investigated and pursued as part of the defense preparation for trial in this case." Spainhour also testified that "[a] defendant's state of mind at the time of the crime is always [a] relevant area for investigation."

*Testimony of Sandra Brading*

Sandra Brading—who is Spangler's mother—testified that she met with Works "[p]robably ten times" before the jury trial. According to Brading, Works "promised" her that the worst thing Spangler could get convicted of was manslaughter and that he laughed off her concerns. Brading testified that she informed Works "[m]any times" about an incident that had occurred just a few weeks before the shooting of Martinez where Spangler and one of his coworkers "were pistol whipped and attacked and had their billfolds and their money stolen from them."

Specifically, Brading testified:

"I probably mentioned that almost every single time I met with him because I thought that was important, that, you know, he wouldn't have reacted the way he did had

8

that not happened. And he said he was going to take care of it. You know, he, you know, assured me that he understood, and he knew what happened, and he would take care of it."

Brading alleged that she expressed her belief that the prior incident had "set this all in motion" to Works but he told her that there was no need to investigate.

*Testimony of Matthew Works*

Works testified that he has been an attorney since 1982 and had primarily focused his legal career on criminal law both as a prosecutor and defense counsel. He estimated that he had tried over 100 criminal cases with 20 to 40 of those cases involving a homicide. Works recalled that after Spangler retained him, the two met on multiple occasions to prepare for trial.

Works testified about his work on the case, including the review of discovery produced by the State, reading the police reports on the shooting, examining the evidence, and preparing Spangler to testify at trial. According to Works, he believed that the best defense strategy would be to attempt to justify the shooting as self-defense. Although Works remembered that Spangler had told him about an incident where he had been robbed and beaten about a "month or two" before shooting Martinez, he testified that he was not given many details and that he found it significant that Spangler did not report the incident to the police.

Works did not remember whether he spoke with David Miller, the other person who was allegedly beaten and robbed. Instead, Works testified that he believed all the information about the prior incident came from Spangler and his mother. Moreover, Works recalled telling Spangler and his mother that he did not believe possible mental health issues related to the robbery were "sufficient" to introduce at trial.

Works explained that he did not have Spangler examined by a mental health professional because he did not believe the matter warranted any further investigation and he did not believe that Spangler's mental state was a defense to the shooting of Martinez. Works testified that he "didn't think that post traumatic stress disorder would be a defense to the crime itself." He also testified that neither Spangler nor his mother ever told him that Spangler had a mental disease or defect.

Works testified that given the theory of the case and his trial strategy, the fact that Spangler had been robbed and beaten before the shooting would not have changed the outcome of the trial. Works explained that he did not think it would have benefited Spangler to present evidence about the prior incident because it "would indicate that there was violence in his past and he may become a violent person himself, and that's not what we want to paint him as." Works also expressed his fear that the jury may have thought that Spangler was lying about the alleged robbery and beating because it was never reported.

Works explained that his strategy was to present evidence that Spangler was acting defensively—not aggressively—when he shot Martinez. Works testified that he prepared the case for trial on the theory of self-defense. He also pointed out that he was able to convince the jury not to convict Spangler of first-degree murder. Instead, the jury convicted Spangler of the lesser included offense of second-degree murder, which resulted in a substantially lower prison sentence. Ultimately, Works testified that he provided Spangler with effective assistance of counsel.

*Testimony of William Spangler*

At the hearing, Spangler testified that he had been robbed and beaten about three weeks before the shooting of Martinez. Spangler testified that after the incident, he felt

10

nervous and frightened. According to Spangler, he had "periodically" been having "nightmares of the event reoccurring." He also indicated that after the robbery he was "on [his] toes" and ready for another confrontation. Spangler testified that on the night he shot Martinez, he felt frightened and "ran to meet force with force." Spangler explained that he was "acting a little more aggressively and probably was a little more paranoid than" he was normally.

Spangler further testified that he told Works about the robbery during their first meeting at the jail following his arrest. Spangler recalled that Works told him that he would investigate the incident and said he might "get some experts or something like that." Spangler also expressed his belief that his experience with the robbery affected his state of mind on the night he shot Martinez.

*The State's Witnesses*

The State called Jason and Donald Hoffman, the attorneys who represented Spangler on his direct appeal. However, their testimony is not relevant to the issue raised in this appeal. The State also called Matthew Patterson, the lead prosecutor on the case who testified about plea negotiations—or the lack thereof—but gave no opinion regarding the quality of the defense presented at trial.

*The District Court's Ruling*

At the conclusion of the hearing, the district court took the K.S.A. 60-1507 motion under advisement. Following the hearing, the parties submitted written closing arguments. Finally, on September 25, 2018, the district court issued a 73-page written memorandum decision and order granting the motion based on his first claim of ineffective assistance of trial counsel for failing to adequately investigate Spangler's

11

mental health and ordering a new trial. The district court denied relief on the remaining claims for relief.

In the memorandum decision and order, the district court reviewed the evidence presented at the hearing. Although the district court noted that it had difficulty believing Spangler's and his mother's testimony about the robbery and beating, it found that there was no evidence presented to counter their testimony. Significantly, the district court relied heavily on the expert testimony of Spainhour in concluding that trial counsel's performance was deficient for failing to investigate Spangler's mental health status and how it might have affected his state of mind when he shot Martinez. Furthermore, the district court found that based on defense counsel's failure to investigate Spangler's mental health status at the time Martinez was shot, "the result [of the trial] cannot be relied upon." Thus, the district court ordered a new trial.

Thereafter, the State timely filed this appeal.

ANALYSIS

The sole issue presented on appeal is whether the district court erred in concluding that trial counsel provided constitutionally deficient representation to Spangler resulting in a denial of his right to a fair trial. We note that no cross-appeal was filed. Instead, Spangler contends that the district court correctly found that trial counsel's performance was ineffective and that he was denied a right to a fair trial as a result.

When, as here, a district court has conducted a full evidentiary hearing to consider a K.S.A. 60-1507 motion, we review the factual findings to determine whether they are supported by substantial competent evidence and are sufficient to support the district court's legal conclusions. In turn, we review the conclusions of law under a de novo

12

standard. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015); see also *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). This standard of review applies when the district court grants a K.S.A. 60-1507 motion and the State appeals. *McHenry v. State*, 39 Kan. App. 2d 117, 119-20, 177 P.3d 981 (2008). Similarly, we use the same standard to review claims of ineffective assistance of counsel. *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018).

A claim of ineffective assistance of counsel is evaluated under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under the *Strickland* test, a defendant must establish two things:  (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) that the deficient performance resulted in prejudice. *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019). In other words, before an attorney's assistance is determined to be so ineffective as to require a new trial, a defendant must show that there is a reasonable probability the jury would have reached a different result had counsel's performance not been ineffective.

Judicial scrutiny of counsel's performance is highly deferential and requires consideration of all the evidence. The reviewing court must presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Even if a defendant successfully establishes that an attorney's performance was deficient, prejudice must also be shown. To show prejudice, a defendant must establish a reasonable probability that but for the attorney's errors, the result of the proceeding would have been different. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

The question for consideration is not "what is prudent or appropriate [for an attorney to have done], but only what is constitutionally compelled." *United States v. Cronic*, 466 U.S. 648, 665 n.38, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). On appeal, we are interested in whether the adversarial process worked sufficiently so that the defendant received a fair trial.

We note that the State suggests that the district court may have erroneously applied the *Cronic* exception in reaching its decision. The *Cronic* exception is a narrow exception that allows a court to—under limited circumstances—presume prejudice. The exception applies only to limited circumstances, such as when defense counsel has altogether failed to function as an advocate. *Florida v. Nixon*, 543 U.S. 175, 190, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) (quoting *Cronic*, 466 U.S. at 659). We note that under *Cronic*, the exception provides for a new trial when a defendant is completely denied the assistance of counsel at a critical stage of a proceeding without the need to show prejudice. See *Fuller*, 303 Kan. 486-87. However, we do not find the *Cronic* exception to be applicable under the circumstances presented in this case. Accordingly, Spangler was required to meet both prongs of the *Strickland* test.

We do not find the State's suggestion that the district court applied the *Cronic* exception in this case to be supported by our review of the comprehensive memorandum decision and order entered following the evidentiary hearing. Instead, a review of the memorandum decision and order reveals that the district court applied both prongs of the *Strickland* test. First, the district court concluded that trial counsel was ineffective for failing to conduct any investigation about Spangler's mental health status. Second, after finding counsel's performance was deficient, the district court concluded that Spangler suffered prejudice as a result of trial counsel's failure to investigate. Thus, based on our review of the record, we find no indication that the district court applied the *Cronic* exception in this case.

*Substantial Evidence of Deficient Performance*

Turning to the first prong of *Strickland*, we find that there is substantial evidence in the record to support the district court's findings of fact and conclusions of law regarding the deficient performance of trial counsel. Our role is not to substitute our judgment for that of the district court as to this issue. Instead, our role is to determine whether there is substantial evidence in the record to reasonably support the district court's findings of fact and resulting conclusions of law.

At the evidentiary hearing, Spangler presented testimony that defense counsel was informed several times before trial of the prior robbery and beating in which he was the victim. Likewise, Spangler presented evidence that there was a concern that the prior incident may have affected his conduct on the night he shot Martinez. Moreover, Spangler presented the testimony of a clinical psychologist, who rendered the opinion that Spangler displayed symptoms of PTSD following the prior incident and that his mental health status may have been affected on the night of the shooting. In addition, a legal expert with extensive experience in criminal defense testified that trial counsel's representation was deficient because he ignored the information provided to him about the prior crime and failed to investigate how it may have affected Spangler's mental health status.

In determining that defense counsel's performance at trial was ineffective, the district court found:

> "It is clear that trial counsel took in the information provided by [Spangler] and his mother. While [trial counsel] addressed some concerns about possibly introducing another violent act and some potential negatives of using evidence about the robbery/beating, there did not appear to be a clear indication that trial counsel conducted

enough of an investigation into the robbery/beating and its potential effect on [Spangler's] state of mind.

> "The court relies heavily on the expert testimony of Ms. Spainhour that trial counsel should have at least conducted come investigation into [Spangler's] mental health, including seeking some type of mental health screening or evaluation."

We find the district court's findings of fact and conclusions of law to be adequate to comply with Supreme Court Rule 165 (2019 Kan. S. Ct. R. 221) and K.S.A. 2019 Supp. 60-252. Although the district court did not make extensive findings on this issue, it provided sufficient facts upon which a reasonable person could conclude that trial counsel's performance was ineffective. Although trial counsel's strategy is entitled to deference and the outcome of the trial was much better than it could have been based on the first-degree murder charge brought by the State, there is substantial evidence in the record—highlighted by Spainhour's testimony—that trial counsel failed to make a reasonable investigation justifying his strategic choice as it related to Spangler's mental health status at the time he shot Martinez. Thus, we conclude that there is substantial evidence in the record to support the district court's determination that the performance of defense counsel was deficient based on the totality of the circumstances.

*Reasonable Probability of Prejudice*

As recognized above, a K.S.A. 60-1507 motion fails if the movant cannot establish substantial prejudice regardless of whether trial counsel's performance was deficient. In other words, a movant is not entitled to habeas corpus relief if the result of the trial would have been the same with competent counsel. *Salary*, 309 Kan. at 483. So, before an attorney's assistance can be found to be so ineffective as to require a new trial, the movant must show that there is a reasonable probability the jury would have reached a different result had counsel's performance not been ineffective.

16

Here, the State argues that even if defense counsel had properly investigated Spangler's mental health status at the time of the shooting of Martinez, it has not been established with reasonable probability that the result of the trial would have been different. The State correctly points out that the clinical psychologist who evaluated Spangler prior to the evidentiary hearing testified that he did "not appear . . . to be suffering from any major mental disease or defect." The State also points out that Spangler received a self-defense instruction. As a result, the State suggests that even if evidence regarding Spangler's mental health status being affected by the prior robbery had been presented at trial, it would have simply "provided additional support to the subjective prong of self-defense or a claim of imperfect self-defense."

After hearing the testimony presented at the evidentiary hearing, the district court found:

> "The difficulty is that trial counsel should have sought some type of mental health screening or evaluation at the time this matter was in the pre-trial stage. Dr. Barnett conceded that he did not know what an evaluation done 3 years earlier might have indicated. He also conceded that he may—or may not—have come to the same conclusions 3 years earlier. Further, Ms. Spainhour's opinion was based on Dr. Barnett's opinion . . . [Spangler] could have been suffering from PTSD or some other mental illness that would have affected [his] actions the day of the shooting.

> "The question becomes whether trial counsel's conduct undermined the adversarial process to the point that the trial can be relied upon to produce a just result.

> "The court believes that the result in this case cannot be relied upon."

Again, our role is not to substitute our judgment for that of the district court regarding the findings of fact. Based on our review of the record, we find that there is substantial evidence to support the district court's findings relating to the prejudice prong

17

of the *Strickland* test. We also find that the conclusion of law reached by the district court is reasonable based on its findings of fact.

It is important to recognize that *Strickland* provides that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." 466 U.S. at 694. As we noted above, a movant attempting to establish that the deficient performance of counsel resulted in prejudice must show a "'probability sufficient to undermine confidence in the outcome.'" *Sprague*, 303 Kan. at 426.

Based on our review of the record, we conclude that it was reasonable for the district court to find that Spangler established a probability sufficient to undermine the outcome of the trial. Likewise, we conclude that it was reasonable for the district court to find that the deficient performance of defense counsel resulted in prejudice sufficient to undermine confidence in the outcome of the trial. In particular, we find that trial counsel's failure to investigate Spangler's mental health status deprived Spangler of the opportunity to present an "imperfect self-defense" theory at trial.

Affirmed.

18