# FLORIDA *v.* NIXON

No. 03–931.   Argued November 2, 2004—Decided December 13, 2004

GINSBURG, J., delivered the opinion of the Court, in which all other Members joined, except REHNQUIST, C. J., who took no part in the decision of the case.

*George S. Lemieux,* Deputy Attorney General of Florida, argued the cause for petitioner. With him on the briefs were *Charles J. Crist, Jr.,* Attorney General, *Carolyn M.*

*Snurkowski,* Assistant Deputy Attorney General, and *Curtis M. French,* Senior Assistant Attorney General.

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were former *Solicitor General Olson, Assistant Attorney General Wray, Deputy Solicitor General Dreeben,* and *Sri Srinivasan.*

*Edward H. Tillinghast III* argued the cause for respondent. With him on the brief was *Eric M. Freedman.*\*

JUSTICE GINSBURG delivered the opinion of the Court.

This capital case concerns defense counsel's strategic decision to concede, at the guilt phase of the trial, the defendant's commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life. Any concession of that order, the Florida Supreme Court held, made without the defendant's express consent—however gruesome the crime and despite the strength of the evidence of guilt—automatically ranks as prejudicial ineffective assistance of counsel necessitating a new trial. We reverse the Florida Supreme Court's judgment.

Defense counsel undoubtedly has a duty to discuss potential strategies with the defendant. See *Strickland* v. *Washington,* 466 U. S. 668, 688 (1984). But when a defendant, informed by counsel, neither consents nor objects to the course counsel describes as the most promising means to avert a sentence of death, counsel is not automatically barred from pursuing that course. The reasonableness of counsel's performance, after consultation with the defendant yields no response, must be judged in accord with the inquiry generally applicable to ineffective-assistance-of-counsel claims: Did counsel's representation "f[a]ll below an objective standard of reasonableness"? *Id.,* at 688, 694. The Florida Supreme

---

\**Kent S. Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

Court erred in applying, instead, a presumption of deficient performance, as well as a presumption of prejudice; that latter presumption, we have instructed, is reserved for cases in which counsel fails meaningfully to oppose the prosecution's case. *United States* v. *Cronic*, 466 U. S. 648, 659 (1984). A presumption of prejudice is not in order based solely on a defendant's failure to provide express consent to a tenable strategy counsel has adequately disclosed to and discussed with the defendant.

## I

On Monday, August 13, 1984, near a dirt road in the environs of Tallahassee, Florida, a passing motorist discovered Jeanne Bickner's charred body. *Nixon* v. *State*, 572 So. 2d 1336, 1337 (Fla. 1990) *(Nixon I);* 13 Record 2464–2466. Bickner had been tied to a tree and set on fire while still alive. *Id.*, at 2475, 2483–2484. Her left leg and arm, and most of her hair and skin, had been burned away. *Id.*, at 2475–2476. The next day, police found Bickner's car, abandoned on a Tallahassee street corner, on fire. *Id.*, at 2520. Police arrested 23-year-old Joe Elton Nixon later that morning, after Nixon's brother informed the sheriff's office that Nixon had confessed to the murder. *Id.*, at 2559.

Questioned by the police, Nixon described in graphic detail how he had kidnaped Bickner, then killed her.[1] He recounted that he had approached Bickner, a stranger, in a mall, and asked her to help him jump-start his car. 5 *id.*, at 919–921. Bickner offered Nixon a ride home in her 1973 MG sports car. *Id.*, at 922. Once on the road, Nixon directed Bickner to drive to a remote place; en route, he overpowered her and stopped the car. *Id.*, at 924, 926–927. Nixon next put Bickner in the MG's trunk, drove into a wooded area, removed Bickner from the car, and tied her to a tree with

---

[1] Although Nixon initially stated that he kidnaped Bickner on August 11, the kidnaping and murder in fact occurred on Sunday, August 12, 1984. 20 Record 3768–3770.

jumper cables. *Id.*, at 930–931. Bickner pleaded with Nixon to release her, offering him money in exchange. *Id.*, at 928. Concerned that Bickner might identify him, Nixon decided to kill her. *Id.*, at 929. He set fire to Bickner's personal belongings and ignited her with burning objects. *Id.*, at 934–935. Nixon drove away in the MG, and later told his brother and girlfriend what he had done. *Id.*, at 938, 961. He burned the MG on Tuesday, August 14, after reading in the newspaper that Bickner's body had been discovered. *Id.*, at 963, 982.

The State gathered overwhelming evidence establishing that Nixon had committed the murder in the manner he described. A witness saw Nixon approach Bickner in the mall's parking lot on August 12, and observed Bickner taking jumper cables out of the trunk of her car and giving them to Nixon. 13 *id.*, at 2447–2448, 2450. Several witnesses told police they saw Nixon driving around in the MG in the hours and days following Bickner's death. See *id.*, at 2456, 2487–2488, 2498, 2509. Nixon's palm print was found on the trunk of the car. *Id.*, at 2548–2549. Nixon's girlfriend, Wanda Robinson, and his brother, John Nixon, both stated that Nixon told them he had killed someone and showed them two rings later identified as Bickner's. 5 *id.*, at 971, 987; 13 *id.*, at 2565. According to Nixon's brother, Nixon pawned the rings, 5 *id.*, at 986, and attempted to sell the car, *id.*, at 973. At a local pawnshop, police recovered the rings and a receipt for them bearing Nixon's driver's license number; the pawnshop owner identified Nixon as the person who sold the rings to him. 13 *id.*, at 2568–2569.

In late August 1984, Nixon was indicted in Leon County, Florida, for first-degree murder, kidnaping, robbery, and arson. See App. 1, 55. Assistant public defender Michael Corin, assigned to represent Nixon, see *id.*, at 232, filed a plea of not guilty, *id.*, at 468–469, and deposed all of the State's potential witnesses, *id.*, at 53–58. Corin concluded, given the strength of the evidence, that Nixon's guilt was

not "subject to any reasonable dispute." *Id.*, at 490.[2]  Corin thereupon commenced plea negotiations, hoping to persuade the prosecution to drop the death penalty in exchange for Nixon's guilty pleas to all charges. *Id.*, at 336–338, 507. Negotiations broke down when the prosecutors indicated their unwillingness to recommend a sentence other than death. See *id.*, at 339, 508.

Faced with the inevitability of going to trial on a capital charge, Corin turned his attention to the penalty phase, believing that the only way to save Nixon's life would be to present extensive mitigation evidence centering on Nixon's mental instability. *Id.*, at 261, 473; see also *id.*, at 102.  Experienced in capital defense, see *id.*, at 248–250, Corin feared that denying Nixon's commission of the kidnaping and murder during the guilt phase would compromise Corin's ability to persuade the jury, during the penalty phase, that Nixon's conduct was the product of his mental illness.  See *id.*, at 473, 490, 505.  Corin concluded that the best strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase. *Id.*, at 458, 505.

Corin attempted to explain this strategy to Nixon at least three times. *Id.*, at 254–255.  Although Corin had represented Nixon previously on unrelated charges and the two had a good relationship in Corin's estimation, see *id.*, at 466–467, Nixon was generally unresponsive during their discussions, *id.*, at 478–480.  He never verbally approved or protested Corin's proposed strategy. *Id.*, at 234–238, 255, 501. Overall, Nixon gave Corin very little, if any, assistance or direction in preparing the case, *id.*, at 478, and refused to attend pretrial dispositions of various motions, *Nixon I*, 572 So. 2d, at 1341; App. 478.  Corin eventually exercised his

---

[2] Every court to consider this case, including the judge who presided over Nixon's trial, agreed with Corin's assessment of the evidence.  See, *e. g., Nixon* v. *Singletary*, 758 So. 2d 618, 625 (Fla. 2000) *(per curiam)* (evidence of guilt was "overwhelming"); *State* v. *Nixon*, Case No. 84–2324 (Fla. Cir. Ct., Oct. 22, 1997), App. 385; 21 Record 4009–4010.

professional judgment to pursue the concession strategy. As he explained: "There are many times lawyers make decisions because they have to make them because the client does nothing." *Id.*, at 486.

When Nixon's trial began on July 15, 1985, his unresponsiveness deepened into disruptive and violent behavior. On the second day of jury selection, Nixon pulled off his clothing, demanded a black judge and lawyer, refused to be escorted into the courtroom, and threatened to force the guards to shoot him. *Nixon I*, 572 So. 2d, at 1341; 10 Record 1934–1935. An extended on-the-record colloquy followed Nixon's bizarre behavior, during which Corin urged the trial judge to explain Nixon's rights to him and ascertain whether Nixon understood the significance of absenting himself from the trial. Corin also argued that restraining Nixon and compelling him to be present would prejudice him in the eyes of the jury. *Id.*, at 1918–1920. When the judge examined Nixon on the record in a holding cell, Nixon stated he had no interest in the trial and threatened to misbehave if forced to attend. *Id.*, at 1926–1931. The judge ruled that Nixon had intelligently and voluntarily waived his right to be present at trial. *Id.*, at 1938; 11 *id.*, at 2020.

The guilt phase of the trial thus began in Nixon's absence.[3] In his opening statement, Corin acknowledged Nixon's guilt and urged the jury to focus on the penalty phase:

> "In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie Bickner's death. . . . [T]hat fact will be proved to your satisfaction beyond any doubt.
>
> "This case is about the death of Joe Elton Nixon and whether it should occur within the next few years by

---

[3] Except for a brief period during the second day of the trial, Nixon remained absent throughout the proceedings. See *Nixon I*, 572 So. 2d 1336, 1341–1342 (Fla. 1990); Brief for Petitioner 6, n. 8.

electrocution or maybe its natural expiration after a lifetime of confinement.

.        .        .        .        .

"Now, in arriving at your verdict, in your penalty recommendation, for we will get that far, you are going to learn many facts . . . about Joe Elton Nixon. Some of those facts are going to be good. That may not seem clear to you at this time. But, and sadly, most of the things you learn of Joe Elton Nixon are not going to be good. But, I'm suggesting to you that when you have seen all the testimony, heard all the testimony and the evidence that has been shown, there are going to be reasons why you should recommend that his life be spared." App. 71–72.

During its case in chief, the State introduced the tape of Nixon's confession, expert testimony on the manner in which Bickner died, and witness testimony regarding Nixon's confessions to his relatives and his possession of Bickner's car and personal effects. Corin cross-examined these witnesses only when he felt their statements needed clarification, see, e. g., 13 Record 2504, and he did not present a defense case, 20 id., at 3741. Corin did object to the introduction of crime scene photographs as unduly prejudicial, 13 id., at 2470, and actively contested several aspects of the jury instructions during the charge conference, 11 id., at 2050–2058. In his closing argument, Corin again conceded Nixon's guilt, App. 73, and reminded the jury of the importance of the penalty phase: "I will hope to . . . argue to you and give you reasons not that Mr. Nixon's life be spared one final and terminal confinement forever, but that he not be sentenced to die," id., at 74. The jury found Nixon guilty on all counts.

At the start of the penalty phase, Corin argued to the jury that "Joe Elton Nixon is not normal organically, intellectually, emotionally or educationally or in any other way." Id., at 102. Corin presented the testimony of eight witnesses.

Relatives and friends described Nixon's childhood emotional troubles and his erratic behavior in the days preceding the murder. See, e. g., id., at 108–120. A psychiatrist and a psychologist addressed Nixon's antisocial personality, his history of emotional instability and psychiatric care, his low IQ, and the possibility that at some point he suffered brain damage. Id., at 143–147, 162–166. The State presented little evidence during the penalty phase, simply incorporating its guilt-phase evidence by reference, and introducing testimony, over Corin's objection, that Nixon had removed Bickner's underwear in order to terrorize her. Id., at 105–106.

In his closing argument, Corin emphasized Nixon's youth, the psychiatric evidence, and the jury's discretion to consider any mitigating circumstances, id., at 194–199; Corin urged that, if not sentenced to death, "Joe Elton Nixon would [n]ever be released from confinement," id., at 207. The death penalty, Corin maintained, was appropriate only for "intact human being[s]," and "Joe Elton Nixon is not one of those. He's never been one of those. He never will be one of those." Id., at 209. Corin concluded: "You know, we're not around here all that long. And it's rare when we have the opportunity to give or take life. And you have that opportunity to give life. And I'm going to ask you to do that. Thank you." Ibid. After deliberating for approximately three hours, the jury recommended that Nixon be sentenced to death. See 21 Record 4013.

In accord with the jury's recommendation, the trial court imposed the death penalty. Nixon I, 572 So. 2d, at 1338. Notably, at the close of the penalty phase, the court commended Corin's performance during the trial, stating that "the tactic employed by trial counsel . . . was an excellent analysis of [the] reality of his case." 21 Record 4009. The evidence of guilt "would have persuaded any jury . . . beyond all doubt," and "[f]or trial counsel to have inferred that Mr. Nixon was not guilty . . . would have deprived [counsel] of any credibility during the penalty phase." Id., at 4010.

On direct appeal to the Florida Supreme Court, Nixon, represented by new counsel, argued that Corin had rendered ineffective assistance by conceding Nixon's guilt without obtaining Nixon's express consent. *Nixon I,* 572 So. 2d, at 1338–1339. Relying on *United States* v. *Cronic,* 466 U. S. 648 (1984), new counsel urged that Corin's concession should be presumed prejudicial because it left the prosecution's case unexposed to "meaningful adversarial testing," *id.,* at 658–659. The Florida Supreme Court remanded for an evidentiary hearing on whether Nixon consented to the strategy, see App. 216–217, but ultimately declined to rule on the matter, finding the evidence of Corin's interactions with Nixon inconclusive, *Nixon I,* 572 So. 2d, at 1340.

In a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (1999), Nixon renewed his *Cronic*-based "presumption of prejudice" ineffective-assistance-of-counsel claim.[4] After the trial court rejected the claim, *State* v. *Nixon,* Case No. 84–2324 (Cir. Ct., Oct. 22, 1997), App. 389–390, the Florida Supreme Court remanded for a further hearing on Nixon's consent to defense counsel's strategy. *Nixon* v. *Singletary,* 758 So. 2d 618, 625 (2000) *(Nixon II).* Corin's concession, according to the Florida Supreme Court, was the "functional equivalent of a guilty plea" in that it allowed the prosecution's guilt-phase case to proceed essentially without opposition. *Id.,* at 622–624. Under *Boykin* v. *Alabama,* 395 U. S. 238, 242–243 (1969), a guilty plea cannot be inferred from silence; it must be based on express affirmations made intelligently and voluntarily. Similarly, the Florida Supreme Court stated, a concession of guilt at trial requires a defendant's "affirmative, explicit acceptance," without which counsel's performance is pre-

---

[4] Nixon contended in the alternative that Corin's decision to concede guilt was unreasonable and prejudicial under the generally applicable standard set out in *Strickland* v. *Washington,* 466 U. S. 668 (1984). App. 385, 389; see *supra,* at 178. Nixon also raised several other challenges to his conviction and sentence. See App. 378–384, 390–392.

sumptively inadequate. *Nixon II*, 758 So. 2d, at 624. The court acknowledged that Nixon was "very disruptive and uncooperative at trial," and that "counsel's strategy may have been in Nixon's best interest." *Id.*, at 625. Nevertheless, the court firmly declared that "[s]ilent acquiescence is not enough," *id.*, at 624; counsel who concedes a defendant's guilt is inevitably ineffective, the court ruled, if the defendant does not expressly approve counsel's course, *id.*, at 625.

On remand, Corin testified that he explained his view of the case to Nixon several times, App. 479–480, and that at each consultation, Nixon "did nothing affirmative or negative," *id.*, at 481–482; see also *id.*, at 486–487. Failing to elicit a definitive response from Nixon, Corin stated, he chose to pursue the concession strategy because, in his professional judgment, it appeared to be "the only way to save [Nixon's] life." *Id.*, at 472. Nixon did not testify at the hearing. The trial court found that Nixon's "natural pattern of communication" with Corin involved passively receiving information, and that Nixon consented to the strategy "through his behavior." *State* v. *Nixon*, Case No. R84–2324AF (Fla. Cir. Ct., Sept. 20, 2001), p. 13; 2 Record 378.

Observing that "no competent, substantial evidence . . . establish[ed] that Nixon *affirmatively* and *explicitly* agreed to counsel's strategy," the Florida Supreme Court reversed and remanded for a new trial. *Nixon* v. *State*, 857 So. 2d 172, 176 (2003) *(Nixon III)* (emphasis in original). Three justices disagreed with the majority's determination that Corin's concession rendered his representation inadequate. *Id.*, at 183 (Lewis, J., concurring in result); *id.*, at 189 (Wells, J., joined by Shaw, S. J., dissenting).

We granted certiorari, 540 U. S. 1217 (2004), to resolve an important question of constitutional law, *i. e.*, whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically renders counsel's performance deficient, and whether coun-

sel's effectiveness should be evaluated under *Cronic* or *Strickland*. We now reverse the judgment of the Florida Supreme Court.

## II

An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*, 466 U. S., at 688. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor* v. *Illinois*, 484 U. S. 400, 417–418 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his· or her own behalf, or take an appeal." *Jones* v. *Barnes*, 463 U. S. 745, 751 (1983); *Wainwright* v. *Sykes*, 433 U. S. 72, 93, n. 1 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

A guilty plea, we recognized in *Boykin* v. *Alabama*, 395 U. S. 238 (1969), is an event of signal significance in a criminal proceeding. By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers. *Id.*, at 243. While a guilty plea may be tactically advantageous for the defendant, *id.*, at 240, the plea is not simply a strategic choice; it is "itself a conviction," *id.*, at 242, and the high stakes for the defendant require "the utmost solicitude," *id.*, at 243. Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf, *Brookhart* v. *Janis*, 384 U. S. 1, 6–7 (1966); moreover, a defendant's tacit

acquiescence in the decision to plead is insufficient to render the plea valid, *Boykin,* 395 U. S., at 242.

The Florida Supreme Court, as just observed, see *supra,* at 185–186, required Nixon's "affirmative, explicit acceptance" of Corin's strategy because it deemed Corin's statements to the jury "the functional equivalent of a guilty plea." *Nixon II,* 758 So. 2d, at 624. We disagree with that assessment.

Despite Corin's concession, Nixon retained the rights accorded a defendant in a criminal trial. Cf. *Boykin,* 395 U. S., at 242–243, and n. 4 (a guilty plea is "more than a confession which admits that the accused did various acts," it is a "stipulation that no proof by the prosecution need be advanced" (internal quotation marks omitted)). The State was obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which Nixon was charged. That aggressive evidence would thus be separated from the penalty phase, enabling the defense to concentrate that portion of the trial on mitigating factors. See *supra,* at 181, 183–184. Further, the defense reserved the right to cross-examine witnesses for the prosecution and could endeavor, as Corin did, to exclude prejudicial evidence. See *supra,* at 183. In addition, in the event of errors in the trial or jury instructions, a concession of guilt would not hinder the defendant's right to appeal.

Nixon nevertheless urges, relying on *Brookhart* v. *Janis,* that this Court has already extended the requirement of "affirmative, explicit acceptance" to proceedings "surrender-[ing] the right to contest the prosecution's factual case on the issue of guilt or innocence." Brief for Respondent 32. Defense counsel in *Brookhart* had agreed to a "prima facie" bench trial at which the State would be relieved of its obligation to put on "complete proof" of guilt or persuade a jury of the defendant's guilt beyond a reasonable doubt. 384 U. S., at 5–6. In contrast to *Brookhart,* there was in Nixon's

case no "truncated" proceeding, *id.*, at 6, shorn of the need to persuade the trier "beyond a reasonable doubt," and of the defendant's right to confront and cross-examine witnesses. While the "prima facie" trial in *Brookhart* was fairly characterized as "the equivalent of a guilty plea," *id.*, at 7, the full presentation to the jury in Nixon's case does not resemble that severely abbreviated proceeding. *Brookhart*, in short, does not carry the weight Nixon would place on it.

Corin was obliged to, and in fact several times did, explain his proposed trial strategy to Nixon. See *supra*, at 181, 186. Given Nixon's constant resistance to answering inquiries put to him by counsel and court, see *Nixon III*, 857 So. 2d, at 187–188 (Wells, J., dissenting), Corin was not additionally required to gain express consent before conceding Nixon's guilt. The two evidentiary hearings conducted by the Florida trial court demonstrate beyond doubt that Corin fulfilled his duty of consultation by informing Nixon of counsel's proposed strategy and its potential benefits. Nixon's characteristic silence each time information was conveyed to him, in sum, did not suffice to render unreasonable Corin's decision to concede guilt and to home in, instead, on the life or death penalty issue.

The Florida Supreme Court's erroneous equation of Corin's concession strategy to a guilty plea led it to apply the wrong standard in determining whether counsel's performance ranked as ineffective assistance. The court first presumed deficient performance, then applied the presumption of prejudice that *United States* v. *Cronic*, 466 U. S. 648 (1984), reserved for situations in which counsel has entirely failed to function as the client's advocate. The Florida court therefore did not hold Nixon to the standard prescribed in *Strickland* v. *Washington*, 466 U. S. 668 (1984), which would have required Nixon to show that counsel's concession strategy was unreasonable. As Florida Supreme Court Justice Lewis observed, that court's majority misunderstood *Cronic* and failed to attend to the realities of defending against a

capital charge. *Nixon III*, 857 So. 2d, at 180–183 (opinion concurring in result).

*Cronic* recognized a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense. *Cronic* instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U. S., at 658. The Court elaborated: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.*, at 659; see *Bell* v. *Cone*, 535 U. S. 685, 696–697 (2002) (for *Cronic's* presumed prejudice standard to apply, counsel's "failure must be complete"). We illustrated just how infrequently the "surrounding circumstances [will] justify a presumption of ineffectiveness" in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, underprepared attorney in a complex mail fraud trial. 466 U. S., at 662, 666.

On the record thus far developed, Corin's concession of Nixon's guilt does not rank as a "fail[ure] to function in any meaningful sense as the Government's adversary." *Id.*, at 666.[5] Although such a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase

---

[5] In his brief before this Court, Nixon describes inconsistencies in the State's evidence at the guilt phase of the trial. See Brief for Respondent 13–22. Corin's failure to explore these inconsistencies, measured against the *Strickland* standard, 466 U. S., at 690, Nixon maintains, constituted ineffective assistance of counsel. The Florida Supreme Court did not address the alleged inconsistencies and we decline to consider the matter in the first instance.

structure vitally affect counsel's strategic calculus.  Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear.  Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous.  See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 329 (1983).[6]  In such cases, "avoiding execution [may be] the best and only realistic result possible."  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1040 (2003).

Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared.  Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course.  See Lyon, Defending the Death Penalty Case: What Makes Death Different? 42 Mercer L. Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation.  This just does not work.  The jury will give the death penalty to the

---

[6] As Corin determined here, pleading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant.  See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.2, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1045 (2003) ("If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights.").  Pleading guilty not only relinquishes trial rights, it increases the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence.  See Goodpaster, 58 N. Y. U. L. Rev., at 331; *supra*, at 184, 188.

client and, in essence, the attorney."); Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L. Rev. 1557, 1589–1591 (1998) (interviews of jurors in capital trials indicate that juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense); *id.*, at 1597 (in capital cases, a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase). In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade." See *Cronic,* 466 U. S., at 656–657, n. 19. Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold. Imploring the judge to spare the boys' lives, Darrow declared: "I do not know how much salvage there is in these two boys. . . . I will be honest with this court as I have tried to be from the beginning. I know that these boys are not fit to be at large." Attorney for the Damned: Clarence Darrow in the Courtroom 84 (A. Weinberg ed. 1989); see Tr. of Oral Arg. 40–41 (Darrow's clients "did not expressly consent to what he did. But he saved their lives."); cf. *Yarborough* v. *Gentry,* 540 U. S. 1, 9–10 (2003) *(per curiam).*

To summarize, in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.

193

\* \* \*

For the reasons stated, the judgment of the Florida Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.