# COURT OF APPEALS
## DECISION
## DATED AND FILED

## June 9, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

---

Appeal No. **2019AP787**

**STATE OF WISCONSIN**

Cir. Ct. No. **2011CF1590**

**IN COURT OF APPEALS
DISTRICT I**

---

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

DUANNE D. TOWNSEND,

      DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: JOSEPH R. WALL, Judge. *Reversed and cause remanded with directions*.

Before Brash, P.J., Dugan and Donald, JJ.

¶1 BRASH, P.J. Duanne D. Townsend appeals from an order of the circuit court denying his WIS. STAT. § 974.06 (2017-18)[1] motion without a hearing.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

In his motion, Townsend argued that postconviction counsel for his direct appeal was ineffective in the presentation of Townsend's claims that his trial counsel was ineffective in multiple ways.

¶2      One of those claims relating to trial counsel's ineffective assistance was that counsel conceded Townsend's guilt and abandoned self-defense as a theory during his trial.  Townsend renewed that claim in his WIS. STAT. § 974.06 motion, asserting that pursuant to the recently decided case *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), counsel's alleged concession was a structural error that entitles him to a new trial.

¶3      Additionally, in his current motion Townsend sought postconviction discovery of the medical records of one of the victims in this case.  He argued that those records would further support his theory of self-defense.

¶4      The circuit court rejected all of Townsend's claims.  The court ruled that *McCoy* was inapposite in this case, and also found that Townsend's claims in his WIS. STAT. § 974.06 motion were procedurally barred.  Moreover, the court reviewed Townsend's claims on the merits, concluding that his trial counsel was not ineffective, and thus Townsend's current claim that postconviction counsel was ineffective necessarily failed.

¶5      We agree that *McCoy* is inapposite based on the facts of this case.  However, we conclude that with regard to his claim of ineffective assistance of postconviction counsel, Townsend has pled sufficient facts in his WIS. STAT. § 974.06 motion and is therefore entitled to a postconviction evidentiary hearing.

**BACKGROUND**

¶6      This case stems from a shooting in April 2011 at an apartment building on West Locust Street in Milwaukee.  It resulted in the death of Brandon Thomas, as well as injuries to two other victims, L.T. and J.W.  Townsend was charged with first-degree intentional homicide and two counts of attempted first-degree intentional homicide for the shooting.

¶7      The shooting was apparently the result of an ongoing dispute between families.  As L.T. explained to police and later testified to at Townsend's trial, several hours before the shootings, Townsend had gotten into an altercation with Rickey Woods, a friend of L.T.'s.  Woods had allegedly left several threatening messages for Townsend's sister, Simone Stewart.  This fight took place at L.T.'s apartment.  J.W., who is the father of L.T.'s daughter, was at L.T.'s apartment during the altercation, but had "passed out" on the couch after drinking.  Additionally, Townsend's girlfriend, April Brown, subsequently arrived at L.T.'s apartment just before the altercation began.  Thomas, who was L.T.'s cousin, was not there at that time.

¶8      L.T. testified that Townsend had a black nine-millimeter gun with an extended clip that he brandished when he arrived at L.T.'s apartment.  However, Woods was not shot during this altercation; rather, he was beaten by Townsend, his brother, Antonio Stewart, and another man L.T. did not know.  L.T. stated that these men beat Woods with pistols and "some brooms, some mops, some trash cans, whatever" they found in the hallway outside of L.T.'s apartment.  Townsend and the other men, along with Brown, then left the apartment building, and L.T. took Woods into her apartment to tend to his wounds.

¶9    L.T. stated that she was afraid that Townsend and the other men would return. As a result, L.T., Woods, and J.W., took her children to a friend's house. Thomas arrived as they were leaving. L.T. said that Thomas made a phone call during which she heard him request a "banger"—a firearm. L.T. also noted that J.W. had discussed getting a Mossberg shotgun. However, L.T. testified that she never saw Thomas or J.W. with a gun that night.

¶10    L.T. explained that as she, Thomas, and J.W. were going back to her apartment, they saw Townsend, Brown, Antonio, and Simone outside one of the entrances to L.T.'s apartment building; Simone also lived in that building. L.T. stated that Townsend was again brandishing the same gun that he had earlier during the altercation with Woods. Townsend's group called L.T.'s group over to where they were standing. L.T. said that initially it was a "normal conversation" between the two groups, but that the conversation soon turned heated as they began discussing the altercation with Woods, and the fact that Townsend had come to L.T.'s apartment earlier with a gun.

¶11    L.T. explained that the groups then moved into Simone's apartment where the argument escalated. Townsend made a comment reminding the others that he had a gun; J.W. replied that "once they gave you a gun they didn't stop making guns," and that he could "go get a Mossberg [shotgun] and blow you as well."

¶12    It was during this heated exchange that Townsend shot L.T. and J.W. L.T. fell to the floor, with J.W. falling next to her, where he shielded her from further shots. L.T. saw Thomas "ma[k]e a run for it"—he ran for the door of the apartment, and had to jump over L.T. and J.W. as they lay on the floor. L.T. then saw Townsend shoot Thomas.

¶13     Milwaukee Police Officers who were in the area on an unrelated call came upon L.T. laying on the ground outside of the apartment building. She was conscious, and told the officers she had been shot. Officers found J.W. and Thomas lying outside the building as well. Other responding officers saw Townsend exiting the rear of the building; when Townsend saw the officers, he ran back inside. Officers located him in a vacant apartment and took him into custody. The officers also found two guns in that vacant apartment: a nine-millimeter Ruger lying on top of a black extended clip, and a .32 caliber revolver that was silver steel with a light wood handle which resembled a "cowboy gun[.]"

¶14     L.T. and J.W. were taken to the hospital where they were both treated for multiple gunshot wounds: J.W. had several shots to his chest, back, stomach, and his right and left arms; L.T. had two shots to her upper right chest and two shots to her upper right back. Thomas was pronounced dead at the scene.

¶15     As previously noted, Townsend was charged with first-degree intentional homicide in the shooting of Thomas and two counts of attempted first-degree intentional homicide for shooting L.T. and J.W. He was also charged with two counts of being a felon in possession of a firearm. The matter proceeded to trial in April 2012.[2]

¶16     At trial, in addition to L.T., Detective Kevin Klemstein also testified. He had interviewed L.T. while she was being treated at the hospital. Detective Klemstein stated that L.T. told him that after she and J.W. had been shot, and Thomas jumped over them as he was running out of the apartment, Thomas's jacket was open and she saw a large "Dirty Harry" gun that was "chrome-colored" with

---

[2] Townsend's trial was presided over by the Honorable Richard J. Sankovitz, who also imposed his sentence. We refer to him as the trial court.

"brown on it." L.T. told the detective that Thomas never pulled the gun out during that second altercation. However, at trial L.T. testified that she never saw a gun on Thomas, and that his jacket was zipped when he attempted to run out of the apartment.

¶17     Additionally, in her police statement L.T. told Detective Klemstein that she had seen Townsend take three Ecstasy pills that night, and had observed him chewing them. However, when L.T. testified at trial she stated that she was not sure whether it was Townsend or his brother who had taken the Ecstasy pills. She further testified that this had occurred only ten to fifteen minutes before the shooting—"not even enough time for the [Ecstasy pills] to kick in." Furthermore, Brown—Townsend's girlfriend—testified that she had not seen Townsend take any pills that night, and that she "[d]id [not] know him to take pills like that."

¶18     Simone also testified. She stated that during the argument in her apartment she heard J.W. say to Townsend "[y]ou don't want to play with guns because we got guns too." At that point, Townsend and J.W. were facing each other, and Simone saw J.W. lift his shirt as if he had a firearm in his waistband. Just after the shooting, Simone found a silver revolver on the floor in her apartment. She picked it up and screamed "whose gun is this?" Townsend came back into the apartment, grabbed the gun from Simone, and ran back out. This was the silver gun that was found with Townsend when he was taken into custody.

¶19     Simone initially told police that J.W. had the silver gun in his waistband prior to the shooting; however, she later admitted that she had not seen

J.W.—or Thomas or L.T.—with that or any other gun during the shooting incident.[3] She further testified that the silver revolver did not belong to her, and that she had not seen anyone with that gun that night.

¶20 J.W. testified that while still in L.T.'s apartment after the altercation with Woods, when he was told that Townsend had a gun and might be coming back, J.W. had made a comment that he should go get his gun. However, J.W. testified that he did not arm himself that night. J.W. also admitted that he was still highly intoxicated during the shooting incident, and therefore only remembered "[b]its and pieces" of the events that night.

¶21 At the close of the State's case, Townsend and his trial counsel discussed the possibility of Townsend testifying. Counsel indicated to the trial court that based on the evidence at that point, Townsend wanted to take the stand to present evidence regarding a self-defense theory. However, that decision hinged on whether the court was going to give the jury instructions regarding self-defense. The State argued that the evidence was not sufficient to warrant the self-defense instructions. It specifically noted that Simone's testimony that J.W. lifted his shirt as if he had a firearm in his waistband was not sufficient to warrant the instructions, given that no one had seen J.W. with a firearm that night.

¶22 Earlier in the trial, the trial court had agreed with the State's position. At the end of the third day of trial—the day before the State rested—the trial court had given the parties a "rough draft" of the proposed jury instructions. The court did not include the self-defense instructions at that point "based on the evidence [it

---

[3] Simone was charged with obstructing an officer for her initial statements to police about the shooting, and for cleaning up the crime scene before police arrived. She pled guilty and was sentenced to probation; as part of the plea bargain, she agreed to testify truthfully at Townsend's trial.

had] heard so far." However, after the State rested, and the court heard arguments by the parties on this issue, the court changed course:

> If a jury believes that [J.W.] pulled up his shirt and had a gun in his waistband, that silver revolver, would it be reasonable for a jury to infer that Mr. Townsend shot because he thought [J.W.] was going to pull out the revolver and shoot him or somebody else in the room?
>
> ….
>
> …I think when we're looking at instructions like this, what we're trying to say is what would happen if the jury believed a certain set of facts existed. I don't think there's anything in here which will allow me, as a matter of law, to say that the jury could not believe that [J.W.] was holding up his shirt showing a gun that wasn't in the room previously.

¶23 Therefore, the court ruled that it would give the self-defense instructions to the jury, along with the instructions for lesser-included charges, including first or second-degree reckless homicide and first or second-degree recklessly endangering safety, as well as second-degree intentional homicide. Townsend decided not to testify.

¶24 During closing arguments, the State refuted Townsend's claim of self-defense, stating that this was actually "a case of Mr. Townsend being angry and pulling the gun and shooting three people." Townsend's trial counsel, on the other hand, noted the chaotic nature of the incident and the conflicting testimony surrounding it. He also mentioned the evidence regarding whether someone besides Townsend was armed that night: the detective's testimony that L.T. had told him Thomas had a gun, and that Simone had found a silver gun after the shootings that she did not recognize. Counsel suggested that the silver gun was the one L.T. saw on Thomas. However, he never specifically stated that Townsend had acted in self-defense.

8

¶25     Additionally, trial counsel stated during his closing argument that Townsend was high on Ecstasy at the time of the shootings. He then observed, "[s]o this was all a preventable tragedy because if [Townsend] hadn't taken three pills of Ecstasy and been drinking, maybe he would [not] have made this terrible tragic decision." To rebut this remark and put the focus back on Townsend's intent, the State, in its rebuttal, noted "[s]o when self-defense fa[i]ls, we try to put this as reckless because he's high and he's drunk."

¶26     The trial court also noted this apparent change in defense strategy. While the jury was deliberating, the court initiated the following exchange:

> THE COURT: Mr. Townsend, in closing arguments [trial counsel] suggested to the jury that it would be acceptable to you if they find you guilty of the reckless homicide [charge] based on all the circumstances. That's his choice to make as a professional. But I think it makes sense at this point to ask if you agree with that strategy.
>
> THE DEFENDANT: No.
>
> THE COURT: And what strategy do you want to pursue?
>
> THE DEFENDANT: Weigh in, to put in their own decision.
>
> THE COURT: Okay. But you don't want them to take any particular verdict among the ones that are being offered to them?
>
> THE DEFENDANT: No, sir; I'm not sure to be honest with you.

¶27     Townsend's trial counsel then explained his strategy: "[o]bviously, I do so not only because of the way the evidence came out but because of the potential exposures that are out there. One is life. One is six years, and one is 12 and a half." The trial court posed no further questions on the matter.

¶28 The jury convicted Townsend of first-degree intentional homicide and two counts of attempted first-degree intentional homicide for the shootings.[4] He received a life sentence, with eligibility for release on extended supervision after forty-five years of initial confinement. He received concurrent sentences for the other counts.

¶29 Townsend, through postconviction counsel, filed his first postconviction motion in preparation for his direct appeal. He alleged that his trial counsel was ineffective in a number of ways, including the failure to present a self-defense theory to the jury. That motion also included a claim that trial counsel should have called several witnesses to support his self-defense theory, including Woods and Antonio. The postconviction court advised postconviction counsel that this claim would be "summarily denied" if he did not submit affidavits from these potential witnesses with his motion. No affidavits were provided with the motion.

¶30 The postconviction court[5] rejected all of Townsend's claims on the grounds that they were insufficiently pled or conclusory. Postconviction counsel subsequently submitted an affidavit from Antonio, which was reviewed but ultimately rejected by the postconviction court. This court affirmed the postconviction court's rulings. *See* **State v. Townsend**, No. 2014AP2395-CR, unpublished slip op. ¶¶15, 23 (WI App July 28, 2015).

---

[4] Townsend was also convicted of the two counts of being a felon in possession of a firearm; those convictions are not at issue in this appeal.

[5] Townsend's first postconviction motion for his direct appeal was decided by the Honorable Jeffrey A. Wagner, as the successor to Judge Sankovitz's homicide calendar. We refer to him as the postconviction court.

10

¶31 Townsend, with new counsel, subsequently filed the WIS. STAT. § 974.06 motion that underlies this appeal. In that motion, he asserted that he is entitled to a new trial due to a structural error—that he was denied his Sixth Amendment right to determine his own defense, pursuant to *McCoy*.[6] He also contended that his initial postconviction counsel was ineffective in the manner in which he presented Townsend's claims of ineffective assistance of trial counsel in his first postconviction motion.

¶32 The circuit court[7] rejected Townsend's motion without a hearing. It held that the facts in *McCoy*—a capital case where the death penalty was being sought—were significantly different from those in this case. Another important difference cited by the circuit court was that the defendant in *McCoy* raised the structural error argument on direct appeal rather than as a collateral attack, as is the case here. As a result, the circuit court, citing *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), reasoned that even assuming there was a structural error, Townsend was required—and had failed—to prove he had been prejudiced by the error.

¶33 Additionally, the circuit court found that Townsend was procedurally barred from bringing his claims of ineffective assistance of trial counsel because they were brought in his direct appeal. It also reviewed those claims on the merits, concluding that trial counsel was not constitutionally ineffective, and thus the arguments in Townsend's WIS. STAT. § 974.06 motion were not clearly stronger

---

[6] *McCoy v. Louisana*, 138 S. Ct. 1500 (2018), was decided shortly after Townsend filed his WIS. STAT. § 974.06 motion. He amended his motion to include the argument based on that decision.

[7] The Honorable Joseph R. Wall presided over Townsend's WIS. STAT. § 974.06 motion. We refer to him as the circuit court.

than the arguments previously brought by postconviction counsel. This appeal follows.

**DISCUSSION**

### 1. Application of *McCoy*

¶34 We begin with Townsend's assertion that the holding in *McCoy*—a recent decision by the United States Supreme Court—is applicable in this case. The *McCoy* court reviewed trial counsel's actions in a capital case: the defendant was accused of committing three murders for which the state of Louisiana was seeking the death penalty. *Id.*, 138 S. Ct. at 1506. The defendant "vociferously insisted" he had not committed the crimes, even though there was "overwhelming" evidence to the contrary. *Id.* at 1505, 1513. Despite the defendant maintaining his innocence throughout the proceedings, during the guilt phase of the trial, trial counsel told the jury that the defendant had "committed three murders…. [H]e's guilty." *Id.* at 1505 (ellipses and brackets in *McCoy*).

¶35 Thus, the issue in *McCoy* was whether trial counsel can, over the objection of the defendant, concede that defendant's guilt. *See id.* The Supreme Court held that doing so is a violation of the Sixth Amendment. *Id.* The Court ruled that because the Sixth Amendment guarantees the right *to present a defense with the assistance of counsel*, a defendant "has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id.* Indeed, the Court declared:

> With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his

12

> innocence, leaving it to the State to prove his guilt beyond a
> reasonable doubt.

*Id.*

¶36 Furthermore, because the issue was "a client's autonomy" and not trial counsel's "competence," the Court stated that the analysis for determining whether counsel's performance was ineffective, as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), is not applicable under such circumstances. *McCoy*, 138 S. Ct. at 1510-11. Rather, the Court deemed this to be a structural error, with the remedy being a new trial "without any need" for a defendant to first show prejudice. *Id.* at 1511.

¶37 Because *McCoy* was decided after Townsend was convicted, our analysis generally would begin with a determination of whether the rule imposed by *McCoy* may be retroactively applied to Townsend's case. However, based on the parameters for the rule as set forth in the decision, we believe that the threshold question is whether the facts of this case are on point with those in *McCoy*, so that we may first ascertain whether the application of the rule would be warranted here.[8]

¶38 The premise of the *McCoy* decision is a defendant's rights under the Sixth Amendment to make "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate," *Florida v. Nixon*, 543 U.S. 175, 187 (2004). These decisions include "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf,

---

[8] The postconviction court found that Townsend's argument regarding *McCoy*'s applicability "fails on the facts," noting the "extreme facts" of *McCoy*—that it was a two-phase capital case where the defendant was facing the death penalty. To the extent that the postconviction court was suggesting that *McCoy* is applicable only in capital cases, we disagree. The *McCoy* court was clear that its rule applies in all criminal cases, where "individual liberty … [is] at stake[.]" *Id.*, 138 S. Ct. at 1505.

and forgo an appeal." *McCoy*, 138 S. Ct. at 1508. When such a decision is at issue, trial counsel "must both consult with the defendant and obtain consent to the recommended course of action." *Nixon*, 543 U.S. at 187.

¶39 Still, the Court has also recognized that there are some situations in which a defendant declines to participate—or even express an opinion—regarding defense strategies. For example, *Nixon* was also a capital case where trial counsel conceded the defendant's guilt during the guilt phase of the trial. *Id.* at 178. The fact that distinguishes it from *McCoy*, however, was that when trial counsel in *Nixon* tried to discuss this concession strategy with the defendant prior to trial, he was "generally unresponsive" and "never verbally approved or protested" the proposed strategy. *Nixon*, 543 U.S. at 181; *see also McCoy*, 138 S. Ct. at 1509. In fact, the defendant in *Nixon* "complained about the admission of his guilt only after trial." *McCoy*, 138 S. Ct. at 1509. Under those circumstances, the *Nixon* court held that trial counsel should not be "impeded by any blanket rule demanding the defendant's explicit consent." *Nixon*, 543 U.S. at 192. Therefore, the *Nixon* court ruled that trial counsel's actions should be analyzed under the *Strickland* paradigm. *Nixon*, 543 U.S. at 192.

¶40 In discussing *Nixon*, the *McCoy* court explained that its rule was "not to the contrary" of that holding:

> If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy [he or] she believes to be in the defendant's best interest. Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way.

14

*McCoy*, 138 S. Ct. at 1509. Thus, the *McCoy* rule recognizing the right "to insist that counsel refrain from admitting guilt" is specific to circumstances in which *the defendant objects* to trial counsel making a concession. *Id.* at 1505.

¶41 For example, in *McCoy*, the defendant "opposed [trial counsel]'s assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.* at 1509. In fact, trial counsel reported that the defendant was "furious" when he was told two weeks before trial that his counsel wanted to concede his guilt to the three murders for which he was charged. *Id.* at 1506. Thus, his counsel knew of the defendant's "complet[e] oppos[ition]" to a concession, because he had "pressed [trial counsel] to pursue acquittal." *Id.* (first two sets of brackets in *McCoy*).

¶42 Here, it is not clear whether Townsend's exchange with the trial court after closing arguments constitutes an objection. When the trial court brought up trial counsel's "concession" during his closing argument—that counsel had "suggested" that it would be acceptable to Townsend if the jury returned a verdict of guilty on one of the reckless homicide charges—the court noted that was trial counsel's "choice to make as a professional." Nevertheless, the court asked Townsend whether he "agree[d] with that strategy," to which Townsend replied "[n]o."

¶43 Yet, when the trial court then asked what strategy Townsend wanted to pursue, Townsend did *not* indicate that self-defense was the only track he was willing to follow. Instead, he merely stated that he wanted the jury to "[w]eigh in, to put in their own decision" and that he was "not sure" whether he wanted the jury to follow any particular path based on the instructions it had been given. Thus, his "objection" was ambiguous at best.

¶44  Furthermore, although Townsend's trial counsel requested—and was granted—the inclusion of the self-defense jury instructions, he also requested instructions for applicable lesser-included charges as well. Moreover, during that discussion the trial court asked Townsend directly if he understood the discussion and agreed with the request for jury instructions for all those lesser-included crimes; Townsend replied affirmatively.

¶45  Thus, while it is clear that Townsend wanted to pursue a theory of self-defense, his statements do not reflect that this was his only defense objective. Put another way, Townsend never made an "express statement[]" to his trial counsel that he did not want to pursue any other defense strategy. *See id.* at 1509. Indeed, since Townsend had agreed that instructions for lesser-included crimes should be given to the jury, counsel's reference in his closing argument to evidence that supported a verdict of one of those lesser-included crimes does not conflict with Townsend's agreement to include the jury instructions for those crimes.

¶46  Instead, these facts are more in line with *Nixon*, where the defendant neither approved nor protested against trial counsel's strategy until after trial. *See id.*, 543 U.S. at 181; *McCoy*, 138 S. Ct. at 1509. Under these circumstances, trial counsel here should not be "impeded by any blanket rule" requiring Townsend's "explicit consent." *See Nixon*, 543 U.S. at 192. Therefore, we conclude that Townsend's trial counsel was not restricted from referencing his alleged use of Ecstasy prior to the shootings to indicate reckless behavior, as a means of suggesting that one of the lesser-included crimes was more applicable to these circumstances.

¶47  In other words, the record here does not indicate the type of structural error described in *McCoy*. Therefore, we need not reach a determination of whether *McCoy* could retroactively be applied, because the facts of this case do not warrant

the application of its rule here. Furthermore, in the absence of such a structural error, Townsend's claim is not entitled to a presumption of prejudice, but rather should be analyzed within the parameters of *Strickland*.[9]

### 2. Claim of Ineffective Assistance of Postconviction Counsel

¶48     Thus, we turn to Townsend's claim of ineffective assistance of postconviction counsel. To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687. The defendant "must prevail on both parts of the test to be afforded relief." *State v. Allen*, 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433. We review *de novo* "'the legal questions of whether deficient performance has been established and whether it led to prejudice rising to a level undermining the reliability of the proceeding.'" *State v. Roberson*, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111 (citation omitted).

---

[9] Townsend also cites *United States v. Cronic*, 466 U.S. 648 (1984), in support of his argument that these circumstances warrant a presumption of prejudice. In *Cronic*, the issue was whether a twenty-five day preparation period before trial in a mail fraud case was insufficient to comply with the Sixth Amendment right to effective counsel. *Id.* at 649-50. The Court recognized that in cases where trial counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659. However, the Court held that was not the case in *Cronic*, and that the defendant's claims of ineffectiveness required an analysis of trial counsel's performance. *Id.* at 652-53. Incidentally, *Cronic* was decided by the Court on the same day as *Strickland*.

In any event, we find *Cronic* to be inapposite, as that fact set is in no way comparable to the instant case.

Additionally, we note that in the instant case, the circuit court held that even if there was a structural error, Townsend would still have to prove prejudice since the issue is being raised on collateral review as opposed to his direct appeal, citing *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017). However, the Court in *Weaver* plainly states that its holding was limited to "the context of trial counsel's failure to object to the closure of the courtroom during jury selection." *Id.* at 1907. Therefore, we do not discuss *Weaver* in this decision.

¶49    Townsend asserts that his postconviction counsel who filed his first postconviction motion for his direct appeal was ineffective in the manner in which he "briefed and presented meritorious claims for ineffective assistance of trial counsel[.]"  Townsend argues that postconviction counsel made conclusory and undeveloped assertions, violated a court order, failed to cite case law, and failed to allege or argue prejudice, which caused the postconviction court, as well as this court, to reject his claims.  *See Townsend*, No. 2014AP2395-CR, ¶¶11-12.  Thus, Townsend contends that "[a]t a minimum" the ineffectiveness of his postconviction counsel "cost [Townsend] an evidentiary hearing" on the ineffective assistance of trial counsel claims asserted in his first postconviction motion.

¶50    The decision to deny Townsend an evidentiary hearing on the ineffective assistance claims in his first postconviction motion was based on the well known standard of review.  A claim of ineffective assistance requires that a postconviction evidentiary hearing be held "to preserve the testimony of trial counsel," *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979), but a defendant is not automatically entitled to a *Machner* hearing, *State v. Bentley*, 201 Wis. 2d 303, 309-10, 548 N.W.2d 50 (1996).

¶51    Rather, the postconviction court is required to hold an evidentiary hearing only if the defendant has alleged "sufficient material facts that, if true, would entitle the defendant to relief." *Allen*, 274 Wis. 2d 568, ¶9.  If, on the other hand, the postconviction motion "does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the postconviction court, in its discretion, may either grant or deny a hearing. *Id.*

¶52     The State contends, and the circuit court agreed, that Townsend's ineffective assistance of counsel claims in his WIS. STAT. § 974.06 motion are barred because they were already litigated in his direct appeal.  "A matter once litigated may not be relitigated in a subsequent postconviction proceeding[.]" *State v. Witkowski*, 163 Wis. 2d 985, 990, 473 N.W.2d 512 (Ct. App. 1991).  However, the gist of Townsend's argument is that the claims in his first postconviction motion were *not* actually litigated; instead, they were rejected as insufficient and conclusory, due to the ineffectiveness of his first postconviction counsel.  Therefore, Townsend contends that the procedural bar should not apply here.

¶53     Generally, a defendant who is seeking relief under WIS. STAT. § 974.06 following a prior postconviction motion and appeal must establish a "sufficient reason" for failing to previously raise any issues that could have been raised in the earlier proceedings; otherwise, the claims are barred.  *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994).  A claim of ineffective assistance of postconviction counsel may present a "sufficient reason" to overcome that procedural bar.  *See State ex rel. Rothering v. McCaughtry*, 205 Wis. 2d 675, 682, 556 N.W.2d 136 (Ct. App. 1996).  To establish that postconviction counsel was ineffective, a defendant "must demonstrate that the claims he [or she] wishes to bring are clearly stronger than the claims postconviction counsel actually brought."  *State v. Romero-Georgana*, 2014 WI 83, ¶4, 360 Wis. 2d 522, 849 N.W.2d 668.  This is determined by "compar[ing] the arguments now proposed against the arguments previously made."  *See id.*, ¶46; *see also Lee v. Davis*, 328 F.3d 896, 900 (7th Cir. 2003).

¶54     We thus review the facts alleged in Townsend's WIS. STAT. § 974.06 motion to determine whether these arguments are clearly stronger than those of his first postconviction motion.  Whether a § 974.06 motion has raised sufficient facts

to entitle a defendant to a *Machner* hearing is a question of law that we review *de novo*. *Allen*, 274 Wis. 2d 568, ¶9. To be deemed sufficient, the motion "must include facts that 'allow the reviewing court to meaningfully assess [the defendant's] claim.'" *Id.*, ¶21 (brackets in *Allen*). A motion will generally meet this standard if it "allege[s] the five 'w's' and one 'h'; that is, who, what, where, when, why, and how." *Id.*, ¶23.

¶55 In Townsend's current motion under WIS. STAT. § 974.06, the alleged facts are sufficiently pled to answer all of these questions. Townsend's assertions that postconviction counsel in his first motion "presented cursory allegations, failed to marshal evidence and legal research, violated a court order, and failed to explain how [trial counsel]'s deficient performance affected the outcome of the trial" are supported by the holdings of the postconviction court and this court in his direct appeal. *See Townsend*, No. 2014AP2395-CR, ¶¶11-12. He then explains how and why, based on the underlying premise of his ineffective assistance claim—that his trial counsel did not present a cogent theory of self-defense—the deficiencies of his postconviction counsel prejudiced him by failing to provide sufficient facts that would have entitled him to a *Machner* hearing. *See State v. Balliette*, 2011 WI 79, ¶28, 336 Wis. 2d 358, 805 N.W.2d 334 (a § 974.06 motion based on ineffective assistance of postconviction counsel "must lay out the traditional elements of deficient performance and prejudice to the defense").

¶56 In particular, the first postconviction motion alleged a deficiency by trial counsel in failing to call several witnesses to support his self-defense theory—most significantly, Rickey Woods and Antonio Stewart. The postconviction court specifically ordered that postconviction counsel submit affidavits from these witnesses with the motion, or the claim would be "summarily denied[.]" Postconviction counsel failed to obtain the affidavits in a timely manner. He did

subsequently submit an affidavit from Antonio, and requested reconsideration of the postconviction court's denial of the first postconviction motion. That request was denied.

¶57 For his WIS. STAT. § 974.06 motion, Townsend's new postconviction counsel obtained and submitted affidavits from Woods and Antonio. This fact is sufficient to indicate a potential deficiency on the part of Townsend's first postconviction counsel. *See Strickland*, 466 U.S. at 691 (to prove a deficiency, a defendant must show that counsel's actions or omissions were "professionally unreasonable"). We thus review the affidavits for their potential to demonstrate prejudice.

¶58 In Woods' affidavit, he avers that he heard Thomas and L.T. talking about obtaining a gun prior to the shooting to exact revenge on Townsend for the altercation with Woods. Additionally, in the circuit court's discussion about this claim, the circuit court noted that Woods had identified the silver revolver as belonging to Thomas. Nevertheless, the circuit court determined that Townsend would have gotten "very minimal mileage" from Woods' testimony when compared to the evidence against Townsend. However, this testimony directly supports Townsend's theory of self-defense.

¶59 With regard to Antonio's affidavit, he avers that he saw a gun in J.W.'s hand during the shooting. Again, this supports Townsend's theory of self-defense. However, the affidavit was rejected by both the postconviction court and the circuit court for failing to demonstrate prejudice.

¶60 In the first postconviction proceeding, the postconviction court reviewed Antonio's untimely affidavit in its denial of Townsend's motion for reconsideration. The court noted the testimony of L.T. and Simone, who stated that

they did not see J.W. with a gun, and the testimony of J.W., who said he did not have a gun. However, Simone also testified that J.W. had lifted his shirt when he was facing Townsend as if he had a gun in his waistband. In any event, had Antonio testified at trial to the information contained in his affidavit, his credibility "would have been a factor for the jury to consider…. The jury would have had to determine the weight and credibility to assign" to his testimony in conjunction with the other witnesses' testimony. *See State v. Jenkins*, 2014 WI 59, ¶65, 355 Wis. 2d 180, 848 N.W.2d 786 (citation omitted; ellipses in *Jenkins*).

¶61 The circuit court, in reviewing Townsend's WIS. STAT. § 974.06 motion, also rejected Antonio's affidavit, citing a failure to demonstrate deficiency as well as prejudice. The circuit court characterized Antonio as "a violent hooligan" whose testimony would only serve to "further incriminate Townsend for these shootings." However, it was undisputed that Townsend shot the three victims; rather, his postconviction claims focus on his self-defense theory: whether trial counsel was ineffective in its presentation at trial, and whether postconviction counsel was ineffective in initially presenting this claim in his first postconviction motion. Thus, Antonio's affidavit should be reviewed in terms of whether its averments support Townsend's theory of self-defense, and thus whether trial counsel's failure to call Antonio to testify at trial was potentially prejudicial to Townsend's case. These facts, as alleged in the § 974.06 motion, are sufficient to support this argument.

¶62 With regard to the theory of self-defense, the circuit court pointed out—and we agree—that it was not completely abandoned during trial. As we discussed above, the trial court gave the self-defense instruction to the jury, and trial counsel discussed the evidence surrounding the silver revolver during his closing argument. However, trial counsel also referenced reckless behavior on Townsend's

22

part for allegedly taking Ecstasy prior to the shooting, even though the evidence was conflicting as to whether Townsend took the pills that night. Townsend's WIS. STAT. § 974.06 motion asserts that this concession compounded the prejudicial affect of trial counsel's other errors. When there are "numerous deficiencies" in trial counsel's performance, a court "need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice." *State v. Thiel*, 2003 WI 111, ¶59, 264 Wis. 2d 571, 665 N.W.2d 305.

¶63 After reviewing Townsend's WIS. STAT. § 974.06 motion, his first postconviction motion, and the record, we conclude that Townsend's current motion has sufficiently alleged facts that demonstrate that his claim of ineffective assistance of postconviction counsel is clearly stronger than the claims that were presented in his first postconviction motion. Therefore, his claims are not procedurally barred. *See* **Romero-Georgana**, 360 Wis. 2d 522, ¶4. Furthermore, because these allegations, if true, support his assertions that trial counsel committed prejudicial errors in failing to present a thorough case for self-defense, Townsend is entitled to a *Machner* hearing. *See Allen*, 274 Wis. 2d 568, ¶9.

¶64 This conclusion also applies to Townsend's request for postconviction discovery of L.T.'s medical records relating to the shooting. Townsend presents this request in conjunction with his overarching claim that trial counsel failed to present a thorough case for self-defense. Specifically, Townsend contends that L.T.'s medical records would demonstrate that she was not shot in the back—as she testified, and as the State argued in its closing—but rather in the chest. Townsend argues that showing that L.T. was facing him when she was shot is more consistent with his self-defense theory.

23

¶65    This argument was not included in Townsend's first postconviction motion.   Thus, our conclusion that Townsend's WIS. STAT. § 974.06 motion has presented arguments that are clearly stronger than those presented by postconviction counsel in his first postconviction motion is extended to this claim as well.  *See Romero-Georgana*, 360 Wis. 2d 522, ¶4.   Accordingly, Townsend's *Machner* hearing should also include evidence regarding this claim to determine whether postconviction discovery is warranted.  *See State v. O'Brien*, 223 Wis. 2d 303, 320, 588 N.W.2d 8 (1999) (a defendant has the right "to utilize post[]conviction discovery when the evaluation is of evidence that is 'critical, relevant, and material'" to the presentation of a "complete defense") (citation omitted)).

¶66    Therefore, we reverse and remand this matter for further proceedings consistent with this decision.  To be clear, this court is neither finding that trial counsel's performance was deficient nor that Townsend suffered any prejudice.  We are merely finding that Townsend alleged sufficient facts to entitle him to a *Machner* hearing.

*By the Court.*—Order reversed and cause remanded with directions.

Not recommended for publication in the official reports.