*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

NICHOLAS JAMES VONTZ,

Defendant-Appellant.

UNPUBLISHED
June 24, 2021

No. 346473
Monroe Circuit Court
LC No. 18-244318-FH

Before: MURRAY, C.J., and FORT HOOD and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of four counts of aggravated stalking, MCL 750.411i, and four counts of using a computer to commit a crime, MCL 752.796; MCL 752.797(3)(d).[1] Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 76 to 240 months' imprisonment for each count of aggravated stalking, and concurrent terms of 134 to 360 months' imprisonment for each count of using a computer to commit a crime, with the latter sentences to be served consecutive to the former sentences. Finding no error requiring reversal, we affirm.

## I. BACKGROUND

Defendant and his former girlfriend, CL, dated for four years and had two children together. They had an on-again, off-again relationship that CL ended in February 2018. On February 4, 2018, defendant asked to come over to talk for five minutes, and CL agreed. CL testified that defendant sat down on her couch, opened his backpack and pulled out a gun. CL left the room and, shortly after, she heard a gunshot and believed that defendant had killed himself. After confirming that the children were still asleep upstairs, CL returned to the living room and discovered that defendant had not shot himself. However, CL testified, the bullet went through the living room ceiling, through the floor and ceiling of her eldest child's room, and lodged into the roof. CL allowed defendant to stay the night, but she reported the incident to the police the

---

[1] Defendant was acquitted of a fifth count of aggravated stalking.

-1-

next day, resulting in defendant's arrest and three-day incarceration on suicide watch. CL also procured a personal protection order (PPO) the same day. Although the original PPO allowed contact, it was later modified to prohibit contact after defendant continued to communicate with CL about matters other than their children and parenting time. Defendant was served the modified PPO on March 4, 2018. Thereafter, CL testified, defendant continued to send her constant text messages, repeatedly call her, and send her Facebook messages. CL reported defendant's violation of the modified PPO to the police, and he was arrested on March 9, 2018. Defendant did not deny attempting to contact CL after he was served the modified PPO.

After defendant was convicted and sentenced as noted above, he filed a motion for remand with this Court for the purpose of raising five claims of error before the trial court. We granted the motion to remand in part, limiting the remand to a motion for appropriate relief as to his claim that he was incompetent to stand trial. *People v Vontz*, unpublished order of the Court of Appeals, entered April 10, 2020 (Docket No. 346473). On remand, the parties stipulated that the Monroe County Jail administered 60 milligrams (mg) of the antidepressant Remeron to defendant each day for nearly all of his incarceration there, between March and December 2018.[2] They also agreed that the maximum dosage recommended by the Food and Drug Administration (FDA) was 45 milligrams (mg) a day. The trial court heard testimony from Dr. Charles Dennis Simpson, an expert in neuropsychopharmacology, about the adverse effects of excessive Remeron and the impact it may have had on defendant's mental state at the time of the trial. Defendant's stepsister Christine Perez, his trial counsel, and the licensed nurse practitioner who administered defendant's prescription medications at the county jail testified about their observations of defendant while he was on the high dosage of Remeron. Defendant also testified about the effects he experienced. The trial court ultimately determined that defendant was competent at the time of his trial and, therefore, denied his motion for a new trial.

## II. COMPETENCY TO STAND TRIAL

Defendant first argues that the trial court abused its discretion by finding him competent and by refusing to admit his postjudgment medical records from the Michigan Department of Corrections (MDOC) at the hearing on remand. We disagree.

We review a trial court's determination of a defendant's competence for an abuse of discretion. *People v Kammeraad*, 307 Mich App 98, 138; 858 NW2d 490 (2014). Evidentiary issues are likewise reviewed for an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). "An abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *Kammeraad*, 307 Mich App at 140 (cleaned up). A trial court's factual findings are reviewed for clear error. MCR 2.613(C); *People v Bylsma*, 493 Mich 17, 26, 825 NW2d 543 (2012). "A ruling is clearly erroneous if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Bylsma*, 493 Mich at 26 (cleaned up).

---

[2] The attorneys agreed that, according to the medical records, defendant was not given Remeron on the day of his trial, but defendant testified that he received Remeron with breakfast and lunch.

A criminal defendant's competence to stand trial is governed by provisions of the Mental Health Code, MCL 330.2020 *et seq*. *People v Davis*, 310 Mich App 276, 288; 871 NW2d 392 (2015). Under MCL 330.2022(1), "[a] defendant who is determined incompetent to stand trial shall not be proceeded against while he is incompetent." Moreover, as a constitutional matter, due process principles do not permit placing an incompetent defendant on trial. *Medina v California*, 505 US 437, 448-449; 112 S Ct 2572; 120 L Ed 2d 353 (1992). See also *Kammeraad*, 307 Mich App at 137 (stating that competency statutes and court rule protect the due process rights of criminal defendants). A defendant is presumed competent and will be deemed incompetent only "if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner." MCL 330.2020(1).

In asserting he was competent to stand trial, defendant argues that the trial court misunderstood Dr. Simpson's testimony and erred with respect to Perez's credibility. We disagree.

Addressing the latter point first, during her testimony, Perez indicated that she was aware of the charges against defendant and did not consider them serious because she knew "the whole inside thing" and other facts about defendant and CL. The court observed that the case was very serious, even if the precise charges did not fully reflect the seriousness, and Perez's assertion to the contrary undermined her credibility. Given the trial court's superior ability to assess a witness's demeanor, tone, attitude, and other subtle indicators of credibility, this Court affords deference to a trial court's credibility determinations. *Kammeraad*, 307 Mich App at 141. Defendant argues that the trial court improperly focused on the circumstances leading to the charges—namely, defendant's discharge of a gun in CL's apartment—rather than the precise charges, i.e., aggravated stalking and using a computer to commit a crime. Although defendant is correct that he was not charged with a weapons offense for discharging the firearm, it was an integral part of the case in that it led CL to obtain the PPO at issue in the aggravated stalking charges. And given Perez's purportedly close relationship with defendant and insistence that she was aware of all the facts, it is highly improbable that she was unaware of what prompted CL to seek the PPO even if Perez did not attend defendant's trial. Further, in making its determination, the court relied heavily on the testimony of Dr. Simpson and defendant's trial counsel, rather than Perez's testimony.

The trial court found Dr. Simpson's testimony very credible and recognized that, according to Dr. Simpson, the high dosage of Remeron defendant was taking had the ability to cause Serotonin Syndrome, "which could bring about agitation, delirium and dizziness, impaired judgment, impaired thinking, [and] impaired memory. He would also have some nausea." The court found it notable that defendant's dosage of Remeron during his pretrial incarceration was not technically an overdose, even if it exceeded FDA recommendations, and Dr. Simpson could not say with certainty that defendant actually suffered from Serotonin Syndrome. Moreover, when informed that defendant testified clearly, without memory lapses, and at a normal pace at trial, Dr. Simpson agreed that those facts would change his opinion about whether defendant was suffering from Serotonin Syndrome. Defendant argues that the trial court failed to appreciate that 60 mg of Remeron on a daily basis is a toxic dosage that Dr. Simpson would expect to impair a person's judgment, presumed that defendant's trial testimony was accurate and consistent with his normal patterns of behavior, and erroneously believed it would find evidence of Serotonin Syndrome in the trial transcript and defendant's jail medical records. We disagree.

Dr. Simpson testified that defendant's daily dosage of Remeron was not "over-prescribed" per se, even though it was approximately 33% higher than the therapeutic level and well into the toxic range. Dr. Simpson also testified that he would expect defendant's judgment to be impaired on the basis of the toxic levels of Remeron. However, Dr. Simpson could not opine on whether defendant was actually impaired at the time of trial. Further, Dr. Simpson testified that although the vast majority of individuals prescribed 60 mg of Remeron daily would likely suffer from Serotonin Syndrome, there was no guarantee that defendant would have suffered from it. Further, he testified that if defendant was experiencing Serotonin Syndrome, defendant would "have trouble articulating accurately from his memory" and "thought process at the time he was speaking." The trial court's summary of the symptoms of Remeron toxicity or Serotonin Syndrome accurately characterized Dr. Simpson's report, though Dr. Simpson also testified that excessive Remeron would cause a patient to "be docile, be quiet, [and] be still." Defendant contends that these last three symptoms would not be apparent from the record, but he ignores the fact that other symptoms—such as agitation, dizziness, or nausea—would likely be noted in medical records, yet no complaints regarding these symptoms are noted in the jail medical records. Additionally, a licensed nurse practitioner testified that defendant was not docile, still, and quiet. Rather, defendant was eager to talk to her when she administered his medications.

Defendant's trial counsel likewise indicated that defendant did not exhibit any behavior that made him question defendant's competency. Defense counsel's only difficulty communicating with defendant involved defendant's tendency to go off on tangents that were not relevant to the case. During these tangents, trial counsel testified, defendant spoke about things that happened with CL years earlier, suggesting that defendant did not struggle with impaired memory. Additionally, defendant testified at trial that he recalled the events leading to the issuance of the PPO "vividly." Further, defendant's testimony about the key facts leading up to and during the subject offenses was generally consistent with CL's testimony, again supporting the finding that defendant's thinking and memory were not unduly impaired.

More importantly, defendant's focus on his contention that he was not acting consistently with his normal patterns of behavior is misplaced. Even if defendant had presented credible evidence to support his assertion, that is not the standard for establishing incompetence to stand trial. A defendant will be deemed incompetent only "if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner." MCL 330.2020(1). Defense counsel testified that defendant was oriented at trial, helped formulate the defense, and wrote a few notes to him during the trial. The trial court accepted defense counsel's testimony as truthful. And although defendant testified that he believed he was appearing for jury selection on the day of his trial, he does not argue on appeal that he failed to understand the nature and object of the trial as it proceeded. While we recognize the concerns raised by Dr. Simpson regarding the possible implications of a defendant being prescribed a drug, beyond that of the FDA recommended amount for an extended period of time, which could lead to potential impairment of a defendant, the hearing testimony supports the trial court's conclusion that defendant was competent to stand trial. We hold that the trial court's conclusion that defendant failed to establish that he was incompetent at the time of trial was within the range of reasonable and principled outcomes and therefore was not an abuse of discretion.

Defendant further argues that the trial court abused its discretion by refusing to admit his posttrial medical records from the MDOC, which he says would have corroborated his testimony

-4-

that he did not understand the effects of Remeron during trial or need the high dosage of Remeron for proper treatment of his mental health condition. The trial court agreed with the prosecution that the records were not relevant to whether defendant was competent at the time of his trial. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Although the MDOC records may have corroborated defendant's testimony at the hearing, he again fails to appreciate the test for competency. Whether he required the high dosage of Remeron or understood how it affected him does not make his competency at the time of trial more or less probable. That is, defendant's posttrial behavior did not make it more or less probable that he understood the nature and object of the proceedings and was capable of assisting the defense at trial. The trial court did not abuse its discretion by excluding the MDOC records.

III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next raises several claims of ineffective assistance of counsel. Defendant has not established entitlement to relief on any of these theories.

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). But because the postjudgment evidentiary hearing was limited to the issue of defendant's competency, our review of defendant's claims is generally limited to mistakes apparent from the existing record. *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018).

A defendant who claims he or she was denied the effective assistance of counsel bears a heavy burden to overcome the presumption of effective assistance. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Muhammad*, 326 Mich App at 63 (cleaned up). The defendant bears the burden of proof with respect to both requirements and must establish a factual predicate for his or her claim. *Id*.

Defendant first argues that defense counsel was ineffective for failing to investigate defendant's competency. The issue of incompetence to stand trial may be raised at any time by the defense, the court, or the prosecution. *Kammeraad*, 307 Mich App at 138. Although there is no comprehensive list of signs that might call a defendant's competency into question, a defendant's irrational behavior, demeanor, and prior medical record may be relevant to determining whether further inquiry is necessary. *Id*. at 139. Defense counsel testified that he saw no signs that defendant may have been incompetent and that defendant appeared oriented and aware of the charges against him. Defense counsel confirmed that defendant participated in formulating the defense. Further, defendant wrote notes to defense counsel during the trial and did not appear unwell or lethargic. Considering these recollections of defendant's behavior and demeanor, trial counsel's decision not to inquire into defendant's competency was not objectively unreasonable. Moreover, because defendant was retrospectively deemed competent at the time of

trial, defendant cannot establish that he was prejudiced by defense counsel's failure to investigate the issue further. *Trakhtenberg*, 493 Mich at 51.

Defendant also argues that he was denied the effective assistance of counsel when defense counsel failed to investigate exculpatory or mitigating evidence, including phone records showing that CL contacted defendant after she claimed to be fearful of him. The record does not support defendant's claim of error. Defense counsel filed a motion to release defendant's cell phone into defense counsel's custody, and the motion was granted on June 29, 2018. Therefore, it appears that defense counsel did investigate the additional records and made a strategic decision not to explore that matter at trial, presumably because the records did not support the defense or would be harmful to the defense for some other reason. Defendant has not overcome the strong presumption that defense counsel acted pursuant to a sound trial strategy. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020).

Defendant additionally contends there was evidence that CL continued to pay his phone bills despite her purported fear. But CL admitted at trial that she deposited money in defendant's phone account because she wanted to make sure he could contact a lawyer, friends, or other support to deal with his situation. Defense counsel was therefore able to, and did, reference the implication of CL's financial contribution to defendant's phone service in closing argument. As such, defendant cannot demonstrate that he was prejudiced by defense counsel's handling of this issue. *Trakhtenberg*, 493 Mich at 51.

Next, defendant argues that he was denied the effective assistance of counsel when defense counsel failed to contact or call two other potential defense witnesses. Defendant supports this claim of error with only his own affidavit stating that the witnesses would have testified about CL's post-PPO phone calls to defendant. Although defendant attached his affidavit to his motion for a new trial on remand, these matters exceeded the scope of the remand order. He filed a separate affidavit regarding the competency issue. Because this Court limited the remand to exploring defendant's competency only, the inclusion of defendant's first affidavit is not part of the record for us to consider. Even if it was properly incorporated in the lower court, defendant's affidavit does not demonstrate that either witness actually had personal knowledge of the events he describes or that they would have been willing and available to testify at trial. As such, defendant has not established the factual predicate for this claim of error. *Muhammad*, 326 Mich App at 63.

## IV. UNAUTHORIZED ADMISSION OF GUILT

Next, defendant argues that defense counsel violated his constitutional right to personal autonomy in selecting the objective of the defense when he admitted defendant's guilt in closing argument. We disagree.

An issue is preserved if it is raised in the trial court and pursued on appeal. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). Unpreserved claims of error are reviewed for plain error affecting the defendant's substantial rights. *People v Caddell*, 332 Mich App 27, 40; 955 NW2d 488 (2020). "Under the plain error rule, a defendant bears the burden of establishing that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *People v Wiley*, 324 Mich App 130, 150-151; 919

NW2d 802 (2018) (cleaned up). "To establish that a plain error affected substantial rights, there must be a showing of prejudice, i.e., that the error affected the outcome of the lower-court proceedings." *Id*. at 151 (cleaned up). Reversal is warranted "only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Thorpe*, 504 Mich 230, 252-253; 934 NW2d 693 (2019).

In *McCoy v Louisiana*, ___ US ___, ___; 138 S Ct 1500, 1505; 200 L Ed 2d 821 (2018), the United States Supreme Court held that a defendant was deprived of his constitutional right to personal autonomy in selecting the objective of his defense when his trial counsel conceded the defendant's guilt over the defendant's objections. The Court reasoned that while a defendant has both the right to counsel and the right to choose self-representation in lieu of counsel, the decision between these two rights was not "all or nothing." *Id*. at ___; 138 S Ct at 1507-1508. A defendant may choose assistance from counsel without surrendering all control over his defense, as some decisions regarding the proceedings are always within the defendant's prerogative. *Id*. at ___; 138 S Ct at 1508. "Autonomy to decide that the objective of the defense is to assert innocence belongs in this . . . category." *Id*. at ___; 138 S Ct at 1508. Whether to concede guilt or maintain innocence "are not strategic choices about how best to *achieve* a client's objectives; they are choice about what the client's objectives in fact *are*." *Id*. at ___; 138 S Ct at 1508. Moreover, when an attorney concedes guilt over a defendant's objection, the error is structural and requires a new trial without a showing of prejudice. *Id*. at ___; 138 S Ct at 1511.

Defendant argues that defense counsel violated his personal autonomy to refrain from admitting guilt when defense counsel admitted that defendant called and texted CL. We disagree. To begin, defense counsel did not directly concede that defendant committed aggravated stalking or using a computer to commit a crime. Rather, he pointed to "the texts" and "a few phone calls," but maintained that aggravated stalking required more than contact and argued that defendant's contacts did not "rise to the level of stalking" merely because they annoyed CL. In contrast, the attorney in *McCoy* specifically admitted that the defendant "committed three murders." *Id*. at ___; 138 S Ct at 1507. More importantly, the defendant in *McCoy* continually and adamantly maintained his innocence throughout the proceedings and was unwilling to concede guilt. This is a pivotal factor that distinguishes *McCoy* from similar cases in which the defendant did not explicitly reject an attorney's strategy and no structural error was found. Compare *id*. at ___; 138 S Ct 1505-1507, 1512, with *Florida v Nixon*, 543 US 175, 181, 185; 125 S Ct 551; 160 L Ed 2d 565 (2004) (involving a defendant who neither approved nor protested defense counsel's concession strategy). Here, there is no indication that defendant opposed defense counsel's partial concession that defendant contacted CL. To the contrary, defendant admitted at trial that he continued to contact CL after having been served the modified PPO. Defense counsel's closing argument was consistent with defendant's own testimony and did not violate defendant's constitutional autonomy in his defense.

## V. DISCOVERY VIOLATION

Defendant next argues that the trial court abused its discretion by allowing a recorded phone call to be played for impeachment purposes when the recording was not disclosed by the prosecution during discovery. We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *Thorpe*, 504 Mich at 252. Although defense counsel indicated that he had not heard the subject recording before when questioned by the court, he did not object to its admission after reviewing it outside the jury's presence.[3] This issue is therefore unpreserved. Unpreserved claims of error are reviewed under the plain error rule articulated in Part IV of this opinion. *Caddell*, 332 Mich App at 40.

Discovery in criminal prosecutions is governed by MCR 2.601. See *People v Elston*, 462 Mich 751, 765-766; 614 NW2d 595 (2000). Defendant filed a discovery request seeking information available under MCR 6.201(A) and (B). At trial, the prosecutor sought to impeach defendant's mother, Sherry Wood, with a recorded phone call in which she said she would kill CL if CL testified. The court asked defense counsel if he had heard the recording before, and defense counsel said he had not. However, defense counsel indicated that he had only reviewed two conversations between defendant and a friend. The prosecutor responded: "I would state that I did play that, but it's more of a rebuttal thing. I can't prepare for what [sic] the defendant calls or doesn't call." The court then concluded that the recording could be played for the jury "because this is cross-examination."

Defendant contends that by failing to disclose the recording before trial, the prosecution violated MCR 6.201(A)(6), which required "a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request." According to defendant, the recording should therefore have been excluded and its admission at trial undermined the reliability of the verdict because the prosecution's case was not strong and turned on an evaluation of whether CL felt terrorized. We disagree.

It was within the trial court's discretion to fashion an appropriate remedy for discovery violations. *People v Rose*, 289 Mich App 499, 525; 808 NW2d 301 (2010). Under MCR 6.201(J), the court "may order the party to provide the discovery or permit the inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances." The court's decision should involve "a balancing of the interests of the courts, the public, and the parties," and "requires inquiry into all the relevant circumstances, including the causes and bona fides of tardy, or total, noncompliance, and a showing by the objecting party of actual prejudice." *Rose*, 289 Mich App at 525-526 (cleaned up). Exclusion of evidence is an extreme remedy that should not be invoked if a less severe sanction can limit the prejudice to the injured party. See *Id*. at 526.

Assuming the recording constitutes tangible physical evidence that should have been disclosed under MCR 6.201(A)(6), the trial court selected an appropriate remedy by allowing

---

[3] Defendant claims that defense counsel did object and the transcript erroneously omits the objection. He filed a complaint against the court reporter, who reviewed the recording and confirmed that page 154 of the transcript is accurate and does not omit any material. A second court reporter also reviewed the recording and verified that there were no omissions.

defense counsel to listen to the recording before it was played for the jury. Defense counsel voiced no objections to the content and requested no further remedy. Moreover, the recording reflected a conversation between Wood and *defendant*, so defendant could not have been surprised by its content. Defense counsel was able to question Wood about the recording and elicit her explanation that she did not mean the threat literally. Under these circumstances, defendant cannot establish that presentation of the recording to the jury constituted plain error, let alone plain error that affected his substantial rights.

## VI. SUFFICIENCY OF THE EVIDENCE

Next, defendant challenges the sufficiency of the evidence supporting his convictions for using a computer to a commit a crime. We find defendant's argument unpersuasive.

Challenges to the sufficiency of the evidence are reviewed de novo on appeal. *People v Bailey*, 330 Mich App 41, 46; 944 NW2d 370 (2019). "Evidence is sufficient if, when viewed in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (cleaned up). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime." *People v Savage*, 327 Mich App 604, 613; 935 NW2d 69 (2019) (cleaned up).

MCL 752.796(1) provides, "A person shall not use a computer program, computer, computer system, or computer network to commit, attempt to commit, conspire to commit, or solicit another person to commit a crime." Defendant argues that there was insufficient evidence that he used a computer, computer program, computer system, or computer network to send the text messages at issue in the aggravated stalking counts. We disagree.

For purposes of the prohibition against using a computer to commit a crime set forth in MCL 752.796, the following definition applies:

> "Computer" means any connected, directly interoperable or interactive device, equipment, or facility that uses a computer program or other instructions to perform specific operations including logical, arithmetic, or memory functions with or on computer data or a computer program and that can store, retrieve, alter, or communicate the results of the operations to a person, computer program, computer, computer system, or computer network. [MCL 752.792(3).]

Defendant concedes that a cell phone satisfies the definition of a computer and that CL received the text messages on her cell phone. He maintains, however, that there was no evidence that he used a computer to generate or send the messages. But while defendant speculates that he might have generated the messages through a "non-computer device," he offers no suggestion as to what sort of noncomputer device would be capable of generating such messages. The prosecution is not obligated to negate every theory consistent with innocence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Moreover, the vast majority of jurors would have sufficient general knowledge about text message communications to reasonably infer that if CL received text messages from defendant, they were sent from a cell phone or other internet-connected device falling within the scope of a computer. Thus, drawing all reasonable inferences in favor of the verdict, there was sufficient evidence from which the jury could have found beyond a reasonable

doubt that defendant used a computer to commit aggravated stalking. *Bailey*, 330 Mich App at 46; *Savage*, 327 Mich App at 613.

## VII. CONSECUTIVE SENTENCING

Lastly, defendant argues that the trial court did not sufficiently explain its reasons for imposing consecutive sentences, so he is entitled to a remand for further explanation or resentencing. We disagree.

We review the imposition of consecutive sentences not mandated by statute for an abuse of discretion, which occurs "when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Norfleet*, 317 Mich App 649, 664; 897 NW2d 195 (2016) (cleaned up).

MCL 752.797(4) authorizes the trial court to order a sentence for using a computer to commit a crime to "be served consecutively to any term of imprisonment imposed for conviction of the underlying offense." But concurrent sentencing is "the norm" in Michigan, and the trial court must state its reasons for imposing consecutive sentencing on the record with sufficient clarity to enable meaningful appellate review. *People v Baskerville*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 345403); slip op at 6. Merely speaking in general terms about common sentencing considerations is not enough. *Norfleet*, 317 Mich App at 666 (finding insufficient reasoning when the court only stated "that it took into account defendant's background, his history, and the nature of the offenses involved") (cleaned up).

Defendant argues that the trial court's on-the-record reasoning was insufficient because it did not specifically refer to consecutive sentencing in its explanation. We disagree. The prosecution submitted a "power and control wheel" with its sentencing memorandum, and the trial court agreed that defendant's harassing conduct fell squarely within the classic pattern and indicators of abusive behavior. It believed that defendant was intentionally trying to influence CL and subject her to his will. The court was especially troubled that defendant fired a gun through the ceiling, placing his sleeping children at risk. The court further observed that use of cell phones to bully has become a common and concerning issue in our society that the court could not countenance. It also shared CL's concerns about what actions defendant might take upon his eventual release from prison, especially considering his lengthy criminal record, which included three domestic violence offenses. Defendant reasoned that his prior domestic violence convictions involved his parents, not a female partner, but the court was unimpressed.

Although the trial court did not explicitly state that each of the foregoing reasons supported its decision to impose consecutive sentencing, it concluded that, having considered "everything in this case," its chosen sentences were proportionate, reasonable, and "more than just." This was not outside the range of principled outcomes. The court cited several particularized reasons for its sentencing decision—defendant's controlling and abusive behavior, lengthy criminal history, pattern of domestic violence incidents, cyber bullying, and extreme act of firing a gun in CL's apartment—that made these offenses particularly severe. Because the trial court sufficiently articulated its reason for imposing the "strong medicine" of consecutive sentencing, *Norfleet*, 317 Mich App at 665, defendant's consecutive sentences did not constitute an abuse of discretion.

Affirmed.

/s/Christopher M. Murray
/s/Karen M. Fort Hood
/s/Michelle M. Rick